**RURAL WATER SYSTEM # 1, an Iowa non-profit corporation, Plaintiff,**

v.

**CITY OF SIOUX CENTER, IOWA, Defendant.**

**No. C 95–4112–MWB.**

United States District Court, N.D. Iowa.

May 27, 1997.

Louis T. Rosenberg, Louis T. Rosenberg, P.C., San Antonio, TX, Randall G. Sease of Sease Law Firm, Hartley, IA, for plaintiff. ·

Ivan T. Webber, Paul Burns, Ahlers, Cooney, Dorweiler, Haynie, Smith & Allbee, P.C., Des Moines, IA, for defendant.

J.W. Dyer of Dyer & Associates Law Firm, McAllen, TX, amicus curiae Iowa Rural Water Association.

**MEMORANDUM OPINION AND ORDER REGARDING CROSS–MOTIONS FOR SUMMARY JUDGMENT**

BENNETT, District Judge.

TABLE OF CONTENTS

I. INTRODUCTION .................................................1497

II. STANDARDS FOR SUMMARY JUDGMENT ..............................1499

III. FACTUAL BACKGROUND ..........................................1501
 A. Undisputed Facts .......................................1501
 B. Disputed Facts .........................................1502

IV. LEGAL ANALYSIS ..............................................1503
 A. The Nature Of RWS # 1's Claims .........................1503
 1. A cause of action for a "violation" of § 1983 .....1503
 2. Other ways to enforce § 1926(b) ...................1505
 B. The Timeliness Of RWS # 1's Claims .....................1507
 1. The timeliness of the § 1983 action ...............1507
 a. The applicable statute of limitations .........1507
 b. "Accrual" and "Continuing violations" .........1508
 2. The timeliness of a declaratory judgment action ...1509
 C. The Merits Of The Claims ...............................1510
 1. Is RWS # 1 entitled to the protections of § 1926(b)? ...1511
 a. The applicable statutes .......................1511
 b. Judicial interpretations ......................1512
 i. Scioto Water .............................1512
 ii. Grand Junction ...........................1514
 c. Plain meaning .................................1516
 i. Rules for "plain meaning" construction ...1516
 ii. Plain meaning of subsection (f) ..........1517
 iii. Ambiguity of subsection (g) ..............1518
 d. Legislative history ...........................1521
 e. RWS # 1's entitlement to § 1926(b) protection ...1523
 2. Has the City violated or threatened to violate § 1926(b)? ...1524
 a. Elements of a claim for violation of § 1926(b) ...1524
 b. "Made service available" .....................1525
 i. Tests ....................................1525
 ii. Interplay of legal right and physical ability to serve ...1525
 iii. Preemption of state-law determinations of service area ...1528
 iv. Interplay of state and federal law .......1529
 c. Where did RWS # 1 make service available? .....1530
 i. Legal authority to serve .................1530
 ii. Physical ability to serve ................1533

V. CONCLUSION ..................................................1534

This "turf war" is not between rival gangs over control of the distribution of some illegal substance in a disputed territory, but between such staid entities as a municipality and a non-profit corporation over distribution of a legal, commonplace, substance: water.

Furthermore, the disputed "turf" is not some section of urban jungle; rather, it is an area bordering the city limits of a quiet rural Iowa town. Finally, the weapons in this "turf war" are not guns or knives, but legal arguments. For example, the parties assert that to determine who has the right to supply water in the disputed area, the court must examine issues as diverse and complex as the nature of the cause or causes of action the plaintiff asserts; the statute of limitations applicable to that action or those actions; the proper interpretation and the constitutionality of an obscure federal statute that provides certain protections to rural water associations from encroachment on their service areas by adjacent municipalities; preemption of state law by federal law; and the applicability here of Iowa statutes defining service areas for various kinds of entities providing rural water services. Yet, however civilized the weapons of the combatants and unremarkable the substance each of the disputants wishes to supply, this "turf war" is as hard-fought as any other.

## I. INTRODUCTION

Plaintiff Rural Water System #1 (RWS #1), a non-profit corporation, filed the original complaint in this lawsuit on November 2, 1995, against defendant City of Sioux Center, Iowa (the City), alleging generally violations of 7 U.S.C. § 1926(b), which protects rural water associations indebted to the United States from encroachment on their service areas by adjacent municipalities. RWS #1 filed an amended complaint on October 22, 1996, in which its claims are clarified somewhat. In the amended complaint, RWS #1's claims are alleged to arise pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, the Civil Rights Act, 42 U.S.C. § 1983, the Attorney's Fees Act, 42 U.S.C. § 1988, and state law. RWS #1's federal claims are premised on alleged violations of 7 U.S.C. § 1926(b) and "willful blindness resulting in bad faith" violation of § 1926(b). Its state-law claims assert tortious interference with customers, tortious

interference with prospective business advantage, and conversion of property.

Rather more specifically, the statute RWS #1 contends the City has violated or is threatening to violate, 7 U.S.C. § 1926(b), prohibits "curtailment" or "limitation" of the service area of a rural water service association that is indebted to the United States by inclusion of any portion of that service area within the boundaries of a municipal corporation. 7 U.S.C. § 1926(b). RWS #1's federal claims, as well as its state-law claims, allegedly arise from the City's annexation of portions of RWS #1's asserted service area, the City's demands that it, not RWS #1, supply the water needs of customers in the annexed areas and within two miles of the City's new boundaries, and the City's actual service to some of the customers in the disputed area, allegedly resulting in "curtailment" or "limitation" of RWS #1's service area.

As relief, RWS #1 requests preliminary and permanent injunctions prohibiting the City's alleged curtailment of RWS #1's service area in violation of 7 U.S.C. § 1926(b); declaratory judgment concerning the rights of the parties to serve the disputed area and alleged violations of state and federal law; equitable relief; damages, both compensatory and punitive; and attorney's fees and costs.

The City answered the original complaint on January 2, 1996, and the amended complaint on November 4, 1996. While the cross-motions for summary judgment now before the court were pending, the City moved and was granted leave to amend its answer to assert affirmative defenses that RWS #1's claims were barred by the running of the applicable statute of limitations and the doctrines of laches and waiver. The City's amended answer was filed on February 12, 1997.

The first of the cross-motions for summary judgment now before the court was filed by the City on January 10, 1997.[1] In that motion, the City asserts that RWS #1 can no longer assert the protections of 7

---

1. The City's motion for summary judgment was first only by hours. All of the cross-motions for summary judgment were filed on the same day,

which, not surprisingly, was the deadline for dispositive motions.

U.S.C. § 1926(b), because it was not indebted to the United States at the time of the annexation of disputed areas by the City. It contends, citing a recent decision of the Sixth Circuit Court of Appeals, that RWS # 1's pay-off of its loans from the Farm Home Administration (FmHA) caused its protection under § 1926(b) to lapse.[2] The City contends further that the annexed area is not part of RWS # 1's service area, nor is any area within two miles of the City's current city limits, by operation of Iowa law, which the City contends is not preempted by federal law. Finally, the City argues that RWS # 1's interpretation of § 1926(b) as revivifying protection of its service area into the area

2. The decision upon which the City principally relies, now published, is *Scioto County Regional Water Dist. No. 1 v. Scioto Water, Inc.,* 103 F.3d 38 (6th Cir.1996) ("*Scioto Water*"). Although *Scioto Water* is the only published decision of a federal circuit court of appeals either this court or the parties have found that considers directly one of the questions presented here-whether a party that has paid off or bought out its loans from the FmHA can still assert the protections of § 1926(b)-it is not even mentioned in RWS # 1's opening briefs in support of RWS # 1's motions for summary judgment. This omission is all the more odd, because not only was the decision of the Sixth Circuit Court of Appeals handed down on December 18, 1996, approximately three weeks before the present cross-motions for summary judgment were filed, but counsel for RWS # 1 here was counsel for the defendants-appellees in the *Scioto Water* case. Nor can RWS # 1's counsel's omission of the decision in *Scioto Water* be excused on the basis that the City had already brought the decision to this court's attention, because the City's and RWS # 1's cross-motions for summary judgment were filed the same day. RWS # 1's counsel thus had no assurance that the City's counsel would bring the *Scioto Water* decision to the court's attention.

It is hardly the issue that the rules of professional conduct require only the disclosure of *controlling authority, see, e.g.,* C.P.R. DR 7–106(B)(1), which the decision of a court of appeals in another circuit certainly is not. In this court's view, the rules of professional conduct establish the "floor" or "minimum" standards for professional conduct, not the "ceiling"; basic notions of professionalism demand something higher. Although the decision of the Sixth Circuit Court of Appeals is obviously not controlling on this federal district court in the Eighth Circuit. RWS # 1's counsel's omission of the *Scioto Water* decision from RWS # 1's opening briefs smacks of concealment of obviously relevant and strongly persuasive authority simply because it is contrary to RWS # 1's position. RWS # 1's counsel did not hesitate to cite a decision of the Colorado Supreme Court on comparable issues, although that decision is factually distinguishable, probably because that decision appears to support RWS # 1's position. This selective citation of authorities, when so few decisions are dead on point, is not good faith advocacy, or even legitimate "hard ball." At best, it constitutes failure to confront and distinguish or discredit contrary authority, and, at worst, constitutes an attempt to hide from the court and opposing counsel a decision that is adverse to RWS # 1's position simply because it is adverse.

Although the impact of RWS # 1's counsel's omission, as a practical matter, is slight, that is again hardly the issue. The issue, as the court sees it, is one of professionalism. Similarly, hardly the issue is RWS # 1's counsel's rather self-serving assertion, when RWS # 1's briefing eventually addressed the *Scioto Water* decision, that that decision should somehow be discounted, because it is "on appeal." The decision of the Sixth Circuit Court of Appeals is not "on appeal"; rather, a petition for certiorari has been filed with, but not yet granted by, the Supreme Court. *See* 65 U.S.L.W. 3666 (Mar. 18, 1997) (No. 96–1498). This court does not believe that it is appropriate to disregard a decision of a federal circuit court of appeals simply because one of the litigants involved in the case in which the decision was rendered disagrees with that decision. Rather, non-controlling decisions should be considered on the strength of their reasoning and analysis, which is the manner in which this court will consider the decisions of the Sixth Circuit Court of Appeals and the U.S. District Court for the Southern District of Ohio in *Scioto Water* and the Colorado Supreme Court in *City of Grand Junction v. Ute Water Conservancy Dist.,* 900 P.2d 81 (Colo.1995) (*en banc*). RWS # 1's counsel should have brought the *Scioto Water* decision to this court's attention for consideration on that basis. Failure to cite obscure authority that is on point through ignorance is one thing; failure to cite authority that is on point and known to counsel, even if not controlling, is quite another.

At oral arguments, counsel for RWS # 1 acknowledged that he should have cited the *Scioto Water* decision in RWS # 1's opening brief, and explained that his principal reason for not doing so was that he was disappointed and surprised by the result in that case. While the court is sympathetic with counsel's disappointment, such disappointment should not have prevented counsel from citing relevant authority. Counsel was given the opportunity at oral arguments in this case to explain his differences with the Sixth Circuit Court of Appeals and the U.S. District Court for the Southern District of Ohio in *Scioto Water,* and he ably did so. However, the point remains that counsel could, and this court believes should, have seized the opportunity to argue the defects counsel perceives in these decisions by including those decisions in RWS # 1's opening brief.

properly annexed by the City and into the two-mile zone beyond those city limits violates the Tenth Amendment to the United States Constitution and expropriates public property for a private purpose in further violation of the Tenth Amendment. In further briefing, the City has also asserted that RWS # 1's only claim is one brought pursuant to 42 U.S.C. § 1983, as 7 U.S.C. § 1926(b) authorizes no separate cause of action, and that any § 1983 claim is barred by the applicable statute of limitations, Iowa's two-year statute of limitations for personal injuries. Iowa Code § 614.1(2).

The same day the City filed its motion for summary judgment, RWS # 1 filed its own separate motions for summary judgment on liability for violation of 7 U.S.C. § 1926(b) and for liability on its claim under 42 U.S.C. § 1983. The motion for summary judgment on liability on the claim brought pursuant to § 1983 clarifies somewhat the nature of that claim, at least as RWS # 1 sees it: the summary judgment motion indicates that the § 1983 claim is that the City violated § 1926(b) under color of Iowa statutes that the City asserted justified its actions.

The City's motion, if granted, would appear to dispose of the case in its entirety, or at least that part of the case upon which federal jurisdiction is founded. However, RWS # 1's motions, if granted, would establish only the City's liability, leaving the appropriate relief to be determined in further proceedings.

On April 8, 1997, the Iowa Rural Water Association filed a request to appear as *amicus curiae* by filing a brief and participating in the oral arguments on the pending dispositive motions. *Amicus curiae* seek to bolster the position of RWS # 1, one of its members, that § 1926(b) is constitutional and would be violated by the City's actions. Over the City's objections, this court has permitted the participation of *amicus curiae* in both the briefing and arguments concerning § 1926(b), concluding that the interests of justice will be served by permitting *amicus curiae* to file a brief and to participate at oral arguments.

The court heard oral arguments of the parties and *amicus curiae* on April 18, 1997.

Plaintiff RWS # 1 was represented at the oral arguments by lead counsel Louis T. Rosenberg of Louis T. Rosenberg, P.C., in San Antonio, Texas, who argued the case on behalf of plaintiff, and local counsel Randall G. Sease of the Sease Law Firm in Hartley, Iowa. Also present on behalf of RWS # 1 was its Manager, Jean Still. Defendant City of Sioux Center, Iowa, was represented by counsel Ivan T. Webber, who argued the case on behalf of the City, and Paul Burns, both of Ahlers, Cooney, Dorweiler, Haynie, Smith & Allbee, P.C., in Des Moines, Iowa. Also present on behalf of the City were Harold Schiebout, City Manager, and Brian Van Engen, City Attorney. *Amicus curiae*, the Iowa Rural Water Association, was represented by counsel J.W. Dyer of Dyer & Associates Law Firm in McAllen, Texas. The arguments and briefing of counsel for the parties and *amicus* were of an unusually high caliber, and of great assistance to the court. Therefore, the court is convinced that, however complicated the issues involved and whatever the court's ultimate disposition may be, the parties and *amicus* were very ably represented.

Because the standards for summary judgment are pertinent to both the factual background of this litigation and the court's legal analysis, the court turns first to a statement of those summary judgment standards. The court will then present a recitation of the facts, both undisputed and disputed, that form the backdrop to the pending dispositive motions. Finally, the court will address as necessary the issues raised in the parties' cross-motions for summary judgment, although not necessarily by taking each of those motions or issues in the order presented by the parties.

## II. STANDARDS FOR SUMMARY JUDGMENT

The Eighth Circuit Court of Appeals recognizes "that summary judgment is a drastic remedy and must be exercised with extreme care to prevent taking genuine issues of fact away from juries." *Wabun–Inini v. Sessions*, 900 F.2d 1234, 1238 (8th Cir.1990). On the other hand, the Federal Rules of Civil Procedure have authorized for nearly 60

years "motions for summary judgment upon proper showings of the lack of a genuine, triable issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986). Thus, "summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.' " *Wabun–Inini,* 900 F.2d at 1238 (quoting *Celotex,* 477 U.S. at 327, 106 S.Ct. at 2555); *Hartnagel v. Norman,* 953 F.2d 394, 396 (8th Cir.1992).

The standard for granting summary judgment, in favor of either a claimant or a defendant, is well established. Rule 56 of the Federal Rules of Civil Procedure states in pertinent part:

Rule 56. Summary Judgment

(a) For Claimant. A party seeking to recover upon a claim, counterclaim, or cross-claim or to obtain a declaratory judgment may, at any time after the expiration of 20 days from the commencement of the action or after service of a motion for summary judgment by the adverse party, move with or without supporting affidavits for a summary judgment in the party's favor upon all or any part thereof.

(b) For Defending Party. A party against whom a claim, counterclaim, or cross-claim is asserted or a declaratory judgment is sought may, at any time, move with or without supporting affidavits for a summary judgment in the party's favor as to all or any part thereof.

(c) Motions and Proceedings Thereon. . . . *The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.*

*Fed.R.Civ.P.* 56(a)-(c) (emphasis added); *see also Celotex,* 477 U.S. at 322–23, 106 S.Ct. at 2552–53; *Reliance Ins. Co. v. Shenandoah S., Inc.,* 81 F.3d 789, 791 (8th Cir.1996); *Beyerbach v. Sears,* 49 F.3d 1324, 1325 (8th Cir.1995); *Munz v. Michael,* 28 F.3d 795, 798 (8th Cir.1994); *Roth v. U.S.S. Great Lakes Fleet, Inc.,* 25 F.3d 707, 708 (8th Cir.1994); *Cole v. Bone,* 993 F.2d 1328, 1331 (8th Cir. 1993); *Woodsmith Publ'g Co. v. Meredith Corp.,* 904 F.2d 1244, 1247 (8th Cir.1990); *Wabun–Inini,* 900 F.2d at 1238 (citing *Fed. R.Civ.P.*56(c)).[3] A court considering a motion for summary judgment must view all the facts in the light most favorable to the non-moving party, and give the non-movant the benefit of all reasonable inferences that can be drawn from the facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (quoting *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962)); *Quick v. Donaldson Co.,* 90 F.3d 1372, 1377 (8th Cir.1996); *Rifkin v. McDonnell Douglas Corp.,* 78 F.3d 1277, 1280 (8th Cir.1996); *Marts v. Xerox, Inc.,* 77 F.3d 1109, 1112 (8th Cir.1996); *Munz,* 28 F.3d at 796; *Allison v. Flexway Trucking, Inc.,* 28 F.3d 64, 66 (8th Cir.1994); *Johnson v. Group Health Plan, Inc.,* 994 F.2d 543, 545 (8th Cir.1993); *Burk v. Beene,* 948 F.2d 489, 492 (8th Cir.1991); *Coday v. City of Springfield,* 939 F.2d 666, 667 (8th Cir.1991), *cert. denied,* 502 U.S. 1094, 112 S.Ct. 1170, 117 L.Ed.2d 416 (1992).

Procedurally, the moving party bears "the initial responsibility of informing the district court of the basis for their motion and identifying those portions of the record which show lack of a genuine issue." *Hartnagel,* 953 F.2d at 395 (citing *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2552–53); *see also Reed v. Woodruff County, Ark.,* 7 F.3d 808, 810 (8th Cir. 1993). The moving party is not required by Rule 56 to support its motion with affidavits or other similar materials negating the opponent's claim. *Id.*

---

**3.** An issue of material fact is genuine if it has a real basis in the record. *Hartnagel,* 953 F.2d at 394 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986)). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Beyerbach,* 49 F.3d at 1326; *Hartnagel,* 953 F.2d at 394.

"When a moving party has carried its burden under *Rule* 56(c), its opponent must do more than simply show there is some metaphysical doubt as to the material facts." *Matsushita,* 475 U.S. at 586, 106 S.Ct. at 1356. The non-movant is required under Rule 56(e) to go beyond the pleadings, and by affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial." *Fed.R.Civ.P.* 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *McLaughlin v. Esselte Pendaflex Corp.,* 50 F.3d 507, 511 (8th Cir.1995); *Beyerbach,* 49 F.3d at 1325. Although "direct proof is not required to create a jury question, . . . to avoid summary judgment, 'the facts and circumstances relied upon must attain the dignity of substantial evidence and must not be such as merely to create a suspicion.'" *Metge v. Baehler,* 762 F.2d 621, 625 (8th Cir.1985) (quoting *Impro Prods., Inc. v. Herrick,* 715 F.2d 1267, 1272 (8th Cir.1983), *cert. denied,* 465 U.S. 1026, 104 S.Ct. 1282, 79 L.Ed.2d 686 (1984)), *cert. denied sub nom. Metge v. Bankers Trust Co.,* 474 U.S. 1057, 106 S.Ct. 798, 88 L.Ed.2d 774 (1986). The necessary proof that the non-moving party must produce is not precisely measurable, but the evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Allison,* 28 F.3d at 66.

In *Anderson,* 477 U.S. at 249, 106 S.Ct. at 2510–11, *Celotex,* 477 U.S. at 323–24, 106 S.Ct. at 2552–53, and *Matsushita,* 475 U.S. at 586–87, 106 S.Ct. at 1355–56, the Supreme Court established that a summary judgment motion should be interpreted by the trial court to accomplish its purpose of disposing of factually unsupported claims, and the trial judge's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial. *Quick,* 90 F.3d at 1376–77; *Johnson v. Enron Corp.,* 906 F.2d 1234, 1237 (8th Cir.1990). The trial court, therefore, must

"assess the adequacy of the nonmovants' response and whether that showing, on admissible evidence, would be sufficient to carry the burden of proof at trial." *Hartnagel,* 953 F.2d at 396 (citing *Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552). If the non-movant fails to make a sufficient showing of an essential element of a claim with respect to which it has the burden of proof, then the moving party is "entitled to judgment as a matter of law." *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2552; *Woodsmith,* 904 F.2d at 1247. However, if the court can conclude that a reasonable trier of fact could return a verdict for the nonmovant, then summary judgment should not be granted. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *Burk,* 948 F.2d at 492; *Woodsmith,* 904 F.2d at 1247. With these standards in mind, the court turns to consideration of the factual background to the parties' cross-motions for summary judgment.

### III. FACTUAL BACKGROUND

#### A. Undisputed Facts

Looking to the parties' statements of facts in support of and resistance to the various motions for summary judgment, the court finds that the following facts are not in dispute. Plaintiff RWS # 1 is a non-profit water corporation created pursuant to Iowa Code Ch. 504A by the filing of articles of incorporation with the Iowa Secretary of State on May 6, 1969.[4] RWS # 1 operates as a retail water service corporation, which began providing or making water services available in 1972. The general area in which RWS # 1 has provided service is an area approximately eighteen miles by thirty-six miles including thirteen townships in Sioux County, Iowa, and six townships in O'Brien County, Iowa.

The City is a municipality located in Sioux County, Iowa. It is surrounded by RWS # 1's service area. However, the City also operates a water supply system and supplies water to customers inside its city limits. Un-

---

**4.** RWS # 1 contends that it is a membership-based association and has never converted from a non-profit corporation to a "special water district" within the meaning of Iowa Code

§ 357A.20. The significance or insignificance of a conversion to a "special water district" under Iowa law will be considered *infra.*

til recently, the parties had an "interconnect" agreement whereby each was to supply emergency water to the other. The City has also from time to time contracted with RWS # 1 for water treatment and supply services and the parties have been involved in other joint uses of facilities.

RWS # 1's building projects were for many years financed by loans from the Farm Home Administration (FmHA) and RWS # 1 is once again indebted to the United States. For example, RWS # 1 obtained loans from the FmHA from 1972 to 1975. However, in 1988, RWS # 1 paid off its existing loans from the FmHA. The FmHA released its existing mortgages and liens on September 22, 1988, and marked the loans "paid in full." RWS # 1 borrowed the money to pay off its federal loans in 1988 from Norwest Bank in Minneapolis, Minnesota. Norwest Bank took no security for its loan. RWS # 1 did not become indebted to the United States again until July 1, 1992, when RWS # 1 again took out a loan from the FmHA. RWS # 1's indebtedness to the United States for 1992 and 1995 totals $2,030,000 and is secured by mortgages and liens to the United States. Thus, RWS # 1 is currently indebted to the United States, but did not have any indebtedness to the United States from September 22, 1988, until July 1, 1992.

In 1989, the City annexed an area of 1,620 acres outside of its 1975 city limits. This annexed area included territory in which RWS # 1 had previously supplied water or had laid pipes and built other facilities. The annexation was completed on December 22, 1989. Another twenty acres, the "Byl subdivision," were annexed in either 1995 or 1996.[5]

RWS # 1 has never applied to the City, pursuant to Iowa Code § 357A.2, to serve water customers in the disputed area, but RWS # 1 disputes here, as a matter of law, whether it was ever required to do so. RWS # 1 does not have a franchise or any easements from the City to provide water services to customers in the disputed territory. Furthermore, RWS # 1 has at times advised the City of requests for connection to the rural water system from customers within two miles of the City's 1989 city limits and has asked the City to advise RWS # 1 whether the City or RWS # 1 should supply the customer. RWS # 1 continues to supply water to some customers now inside the City's 1989 city limits. Since the 1989 annexation, the City has laid some new water service lines that parallel existing water lines of RWS # 1.

### B. Disputed Facts

The City disputes that RWS # 1 has ever secured an exclusive "service area" pursuant to Iowa law. Furthermore, the City disputes the existence of what RWS # 1 refers to as its "federal franchise" for exclusive service to customers in the disputed area, contending that not only was the federal government without power to make such a franchise, a legal question, but that there is no evidence in the record of any such franchise, a factual matter. The City also disputes RWS # 1's contention that the City had no customers outside its 1975 city limits or ever made services available outside of its city limits. Similarly, the City disputes whether RWS # 1 had pipes in the ground in 1975 and 1976 that would have allowed RWS # 1 to provide or make service available within one-and-one-half miles or less of the City's 1975 city limits. The City also disputes the extent to which RWS # 1 was providing or making available water services in the disputed area or the area in which RWS # 1 claims it was providing or making available such services. Furthermore, the City disputes the number of RWS # 1's customers who were inside the area annexed by the City in 1989 and contends that RWS # 1 has "sold" customers to the City since the annexation.

To summarize remaining disputes more generally, the City also disputes the identity of various customers connected to City water lines since annexation and whether these customers were connected to RWS # 1 for their water supply prior to the annexation; the location and purpose of overlapping or parallel water lines of the City and RWS # 1 in

---

**5.** RWS # 1 states that this annexation occurred in 1996, but the City contends that it took place in 1995. It is unclear from the record whether this is an actual factual dispute or simply a question of a typographical error on RWS # 1's part.

the disputed area; and the extent to which any services the City has provided duplicated services available from RWS # 1.

RWS # 1 disputes that it ever converted to, or was ever required to convert from a non-profit corporation to, a "special water district" within the meaning of Iowa § 357A.20, which is a factual matter. Consequently, it also disputes whether it was ever required to apply to the City, pursuant to Iowa Code § 357A.2, to serve water customers in the disputed area, which is either a question of law or a mixed question of law and fact. Finally, the parties dispute whether RWS # 1's pay-off of its federal loans in 1988 was pursuant to the Omnibus Budget Reconciliation Act (OBRA) of 1986 and the Agricultural Credit Act of 1987(ACA), which amended the 1986 OBRA by providing for a "Buy Out Program" of FmHA loans.

## IV. LEGAL ANALYSIS

In their oral arguments, the parties and *amicus* focused on the scope of the protection provided by 7 U.S.C. § 1926(b), continuation of protection of the statute during the FmHA "Buy Out Program," as provided in 7 U.S.C. § 1929a *note*, subsections (f) and (g), and the inter play between § 1926(b) and certain Iowa statutes upon which the City principally relies. Nonetheless, before the court can consider the merits of the parties' arguments for summary judgment on RWS # 1's claim or claims, the court finds that it must first determine what, exactly, is the nature of RWS # 1's claim or claims and how RWS # 1's claim or claims can be brought before the court. The court must then determine whether RWS # 1's action is time-barred, as the City contends. Only if RWS # 1's action is properly before the court will it be necessary for the court to consider any other arguments of the parties.

### A. The Nature Of RWS # 1's Claims

In its combined resistance to RWS # 1's separate motions for summary judgment on liability under § 1926(b) and § 1983, the City contends that RWS # 1 is mistaken in its assertion that it has two separate claims, one

for violation of § 1926(b) itself and another under § 1983 to vindicate rights under § 1926(b). The City contends that such a mistaken notion should have been corrected by reading the decision of the Sixth Circuit Court of Appeals in *Wayne v. Sebring*, 36 F.3d 517 (6th Cir.1994), *cert. denied*, 514 U.S. 1127, 115 S.Ct. 2000, 131 L.Ed.2d 1001 (1995), which RWS # 1 itself cites for the proposition that § 1926(b) includes no enforcement provisions. Thus, the City contends, RWS # 1 has but one cause of action, an action pursuant to § 1983 for alleged violation of rights under § 1926(b).[6]

RWS # 1 responds that courts have enforced the provisions of § 1926(b) and that the legislative history of that provision suggests an intent to create enforceable obligations or prohibitions. This argument, of course, merely begs the question of *how* the prohibitions of § 1926(b) are to be enforced, because the statute plainly does not contain express language authorizing a private cause of action to enforce its terms. However, RWS # 1 also contends that, not only can it enforce its rights by bringing a cause of action for a "violation" of § 1983, which is in turn predicated on a violation of § 1926(b), but it can also bring an action under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, which provides an independent vehicle to obtain not only a declaration of rights under § 1926(b), but further relief for a violation of the statute.

### 1. A cause of action for a "violation" of § 1983

In its motion for summary judgment on liability under § 1983, RWS # 1 asserts that it has proved a "violation" of § 1983, because it has proved a "predicate" violation of § 1926(b). Rural Water System No. 1's Memorandum In Support Of Motion For 42 U.S.C. Sec.1983 Summary Judgment On Liability Pursuant To Fed.R.Civ.P. 56(a) (hereinafter "RWS # 1's Brief On § 1983 Liability"), pp. 2–3. However, as this court has explained on more than one occasion, one does not "violate" § 1983. *See Laird v. Ra-*

---

**6.** The City contends further that such a cause of action is time-barred, which is a matter the court

addresses later in Section IV.B. 1. of this opinion.

**1504**

*mirez,* 884 F.Supp. 1265, 1282 n. 11 (N.D.Iowa 1995); *DePugh v. Smith,* 880 F.Supp. 651, 661 (N.D.Iowa 1995); *Mummelthie v. City of Mason City, Iowa,* 873 F.Supp. 1293, 1315 n. 10 (N.D.Iowa 1995), *aff'd,* 78 F.3d 589 (8th Cir.1996) (table opinion).

■■■ In its prior decisions, this court noted the following:

Title 42 U.S.C. § 1983 provides that

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress....

Section 1983 was designed to provide a "broad remedy for violations of federally protected civil rights." *Monell v. New York City Dept. of Soc. Serv.,* 436 U.S. 658, 685, 98 S.Ct. 2018, 2033, 56 L.Ed.2d 611 (1978). *However, § 1983 provides no substantive rights. Chapman v. Houston Welfare Rights Org.,* 441 U.S. 600, 617, 99 S.Ct. 1905, 1916, 60 L.Ed.2d 508 (1979). *"[O]ne cannot go into court and claim a 'violation of section 1983—for section 1983 by itself does not protect anyone against anything. ' Id. Rather, § 1983 provides a remedy for violations of all 'rights, privileges, or immunities' secured by the Constitution and laws [of the United States]."* 42 U.S.C. § 1983 (emphasis added); *Maine v. Thiboutot,* 448 U.S. 1, 3, 100 S.Ct. 2502, 2503, 65 L.Ed.2d 555 (1980) ("Constitution and laws" means that § 1983 provides remedies for violations of rights created by federal statute, as well as those created by the Constitution).

*Laird,* 884 F.Supp. at 1282 n. 11 (emphasis added); *DePugh,* 880 F.Supp. at 661; *Mummelthie,* 873 F.Supp. at 1315 n. 10. Therefore, RWS # 1 has no claim for a "violation" of § 1983.

■■■ Although RWS # 1 is incorrect to assert a "violation" of § 1983, § 1983 may nonetheless provide a vehicle whereby RWS # 1 may bring before this court its claim of a violation of § 1926(b), a law of the United States. *See Blessing v. Freestone,* —— U.S. ——, ——, 117 S.Ct. 1353, 1359, —— L.Ed.2d ——, —— (1997) ("Section 1983 imposes liability on anyone who, under color of state law, deprives a person 'of any rights, privileges, or immunities secured by the Constitution and laws.' We have held that this provision safeguards certain rights conferred by federal statutes," citing *Thiboutot, infra); Maine v. Thiboutot,* 448 U.S. 1, 3, 100 S.Ct. 2502, 2503–04, 65 L.Ed.2d 555 (1980) (the language "Constitution *and laws*" in § 1983 means that § 1983 provides remedies for violations of rights created by a federal statute, as well as those created by the Constitution). However, resort to a cause of action pursuant to § 1983 to address a violation of a federal statute is *not* available "where the 'governing statute provides an exclusive remedy for violations of its terms.' " *Pennhurst State Sch. & Hosp. v. Halderman,* 451 U.S. 1, 28, 101 S.Ct. 1531, 1545, 67 L.Ed.2d 694 (1981); *accord Blessing,* —— U.S. at ——, 117 S.Ct. at 1360 ("Even if a plaintiff demonstrates that a federal statute creates an individual right, there is only a rebuttable presumption that the right is enforceable under § 1983. Because our inquiry focuses on congressional intent, dismissal is proper if Congress 'specifically foreclosed a remedy under § 1983.... ' Congress may do so expressly, by forbidding recourse to § 1983 in the statute itself, or impliedly, by creating a comprehensive enforcement scheme that is incompatible with individual enforcement under § 1983"; citations omitted); *Foster v. Wyrick,* 823 F.2d 218, 221 (8th Cir.1987) (citing *Pennhurst).* Several courts have concluded that § 1926(b) provides no such exclusive remedy for violations of its terms.

Most recently, the Fifth Circuit Court of Appeals has noted that "[s]ection 1926(b) does not create or specify a remedy for the enforcement of violations." *North Alamo Water Supply Corp. v. City of San Juan, Tex.,* 90 F.3d 910, 917 (5th Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 586, 136 L.Ed.2d 515 (1996). In a more thorough analysis of the issue, the Sixth Circuit Court of Appeals considered whether § 1926(b) it-

self created a private right of action, or whether a private right of action was available for a violation of § 1926(b) via § 1983. *See Wayne v. Village of Sebring,* 36 F.3d 517, 528–29 (6th Cir.1994), *cert. denied,* 514 U.S. 1127, 115 S.Ct. 2000, 131 L.Ed.2d 1001 (1995).[7] The court noted that § 1983 permits suits for violation of federal statutes *unless* "(1) 'the statute does not create enforceable rights, privileges, or immunities within the meaning of § 1983,' or (2) 'Congress has foreclosed such enforcement of the statute in the enactment itself.'" *Id.* (quoting *Wilder v. Virginia Hosp. Ass'n,* 496 U.S. 498, 508, 110 S.Ct. 2510, 2517, 110 L.Ed.2d 455 (1990), in turn quoting *Wright v. Roanoke Redevelopment and Hous. Auth.,* 479 U.S. 418, 423, 107 S.Ct. 766, 770, 93 L.Ed.2d 781 (1987)).

The court found that neither of these two exceptions applied. First, the court found that § 1926(b) created a right that was "judicially enforceable." *Id.* at 529. Next, the court found that the second exception required "'a comprehensive enforcement mechanism for protection of a federal right'" that was not satisfied by "[m]ere availability of administrative protections." *Id.* (quoting *Golden State Transit Corp. v. City of Los Angeles,* 493 U.S. 103, 106, 110 S.Ct. 444, 448, 107 L.Ed.2d 420 (1989)). The court found that Congress had provided "no enforcement mechanism for protecting the right that § 1926(b) creates." *Id.* Therefore, the court found that *"pursuant to § 1983,* § 1926(b) gives rise to a private right of action on the part of rural water service users." *Id.*

This court has employed the same analysis of whether § 1983 provides a cause of action for enforcement of federal statutory rights in other contexts. *Laird,* 884 F.Supp. at 1276–78 (considering whether an action pursuant to § 1983 to enforce rights under the Social Security Act (SSA) was precluded by enforcement mechanisms under the SSA); *Mummelthie,* 873 F.Supp. at 1314 (determining whether the ADEA provided the exclusive remedy for age *discrimination* or whether a cause of action pursuant to § 1983 was also available). Furthermore, this court finds that the reasoning by which the Sixth Circuit Court of Appeals in *Wayne* concluded that § 1983 provided the enforcement mechanism for § 1926(b) "on the part of rural water service users," *Wayne,* 36 F.3d at 529, applies with equal force to the question of whether associations indebted to the FmHA may enforce rights under § 1926(b) against allegedly encroaching municipalities.

This court therefore holds, first, that § 1926(b) creates an enforceable right, but provides no mechanism for its enforcement. Thus, RWS # 1 has no cause of action created by § 1926(b) for violation of its terms. Second, this court holds that one means to enforce the rights created by § 1926(b) is a cause of action *pursuant to,* but not for "violation" of, § 1983.

### 2. Other ways to enforce § 1926(b)

However, the court also concludes that § 1983 does not necessarily provide the *ex-*

---

7. RWS # 1 misconstrues the question and conclusion in the *Wayne* decision. RWS # 1 states that "the issue [in *Wayne]* was actually whether the Code of Federal Regulations ('C.F.R.') could create a private right of action (which the court found to be the case)." Rural Water System No. 1's Reply To Defendant City of Sioux Center's Combined Resistance To Plaintiff's Motions For *Summary* Judgment Under 7 U.S.C. Sec.1926(b) and 42 U.S.C. Sec.1983 (hereinafter "Plaintiff's Reply Brief"), p. 3. RWS # 1's formulation of the question in *Wayne* suggests that the question there was not whether § 1926(b) created a right enforceable via a private cause of action. Contrary to RWS # 1's characterization of the issues and conclusions of the court in *Wayne,* however, the Sixth Circuit Court of Appeals was actually presented with the question of whether a federal regulation could create a cause of action, and the court actually held that it was *not* the federal

regulation, but an ordinance enacted to fulfill the requirements of the regulation, that created a private cause of action. *Wayne,* 36 F.3d at 528. Specifically, the federal regulation in question required applicants for FmHA funding to agree that a person within the service area who can feasibly and legally receive water service has a private right of action against the recipient of the FmHA funding if the recipient fails to make adequate service available. Id. The court held that the private right of action was *not* created by the regulation, but by the municipal body itself, when the municipal body passed an ordinance creating the cause of action to fulfill the requirements of the federal regulation. Id.

More to the point, however, as is discussed in the body of this ruling, the court in *Wayne* did find that, in the alternative, § 1983 provided a private cause of action to enforce rights created by § 1926(b). Id. at 528.

*clusive* vehicle for enforcing rights under § 1926(b), as the City seems to suggest. Thus, there may be other causes of action for a "violation" of § 1926(b) that justify RWS # 1's assertion of a second cause of action, besides its claim pursuant to § 1983, and may further justify RWS # 1's separate motion for summary judgment on liability for violation of § 1926(b).

For example, the Fifth Circuit Court of Appeals noted in *North Alamo Water Supply Corp.*, a decision cited above, that "an injunction has been the principal tool employed by the courts with which to enforce the statute and prevent violations." *North Alamo Water Supply Corp.*, 90 F.3d at 917 (citing *City of Madison, Miss. v. Bear Creek Water Ass'n, Inc.*, 816 F.2d 1057, 1059 (5th Cir. 1987), and *Jennings Water, Inc. v. City of North Vernon, Ind.*, 895 F.2d 311, 315 (7th Cir.1989)). Therefore, where other requirements for injunctive relief were met, such as ample evidence in the record to support an injunction and sufficient specificity of the injunction, the court in the *North Alamo Water Supply Corp.* case upheld injunctive relief as a means to "enforce" § 1926(b). *Id.* at 917. In addition to the decisions cited by the Fifth Circuit Court of Appeals in *North Alamo Water Supply Corp.*, and that decision itself, injunctive relief has been sought or granted in other cases. *See, e.g., Scioto Water,* 103 F.3d at 41 (denying injunctive relief sought for an alleged violation of § 1926(b), not because such relief was unavailable to enforce the statute, but because the plaintiff was not entitled to the protections of § 1926(b)); *Wayne,* 36 F.3d at 531 (injunctive relief granted for a violation of § 1926(b)).

■■■ The willingness of courts to grant injunctive relief for violations of § 1926(b), however, does not necessarily answer the question of what authority creates a private cause of action to seek such relief. Certainly, § 1983 would provide the vehicle to obtain such relief. 42 U.S.C. § 1983 (authorizing a private right of action "at law, suit in equity, or other proper proceeding for redress" for persons injured by a violation of the Constitution or laws of the United States). Thus, a claim for injunctive relief from violations of

§ 1926(b) would seem to fall within the ambit of a § 1983 claim.

■■■ As RWS # 1 suggests, in addition to actions for injunctive relief, courts have entertained declaratory judgment actions to determine whether violations of § 1926(b) have or could occur. *See, e.g., Scioto Water,* 103 F.3d at 41 (declaratory judgment action alleging a violation of § 1926(b) and seeking injunctive relief); *Lexington–South Elkhorn Water Dist. v. City of Wilmore, Ky.,* 93 F.3d 230, 232 (6th Cir.1996) (declaratory judgment action by water district seeking protection from encroachment on its service area by a municipality in violation of § 1926(b)); *see also CSL Utilities, Inc. v. Jennings Water, Inc.,* 16 F.3d 130 (7th Cir.1994) (declaratory judgment action by a private, non-profit water utility against a rural water association indebted to FmHA seeking a declaration that the utility's building of water facility did not violate § 1926(b)), *cert. denied,* 513 U.S. 812, 115 S.Ct. 65, 130 L.Ed.2d 22 (1994). Congress has provided for declaratory judgments by the federal courts through two provisions of the Declaratory Judgment Act, which state, in pertinent part, the following:

**§ 2201. Creation of remedy**

(a) In a case of actual controversy within its jurisdiction, ... any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such. * * *

**§ 2202. Further relief**

Further necessary or proper relief based on a declaratory judgment or decree may be granted, after reasonable notice and hearing, against any adverse party whose rights have been determined by such judgment.

28 U.S.C. §§ 2201(a), 2202. These two provisions establish the means whereby RWS # 1 can obtain not only the declaratory relief it seeks, 28 U.S.C. § 2201, but also such "further" relief as is "necessary and appro-

priate." 28 U.S.C. § 2202. The vehicle of enforcing § 1926(b) afforded by the Declaratory Judgment Act is therefore an alternative to that provided by § 1983.[8]

Because § 1983 is not the only vehicle for enforcement of § 1926(b), RWS #1 has properly asserted two different claims founded on alleged violations of § 1926(b).

## B. The Timeliness Of RWS #1's Claims

### 1. The timeliness of the § 1983 action

The City contends that RWS #1's § 1983 claim is time-barred by the applicable statute of limitations for such actions, Iowa's two-year statute of limitations for personal injuries, Iowa Code § 614.1(2). The City contends that RWS #1 is complaining of actions taken more than two years before suit was filed November 2, 1995. Specifically, RWS #1 complains of actions taken by the City as early as 1987, with the heart of their complaint being that the City improperly annexed disputed territory in 1989. However, the complaint in this matter was not filed until nearly six years later and a § 1983 claim was not specifically asserted until September 30, 1996, almost seven years later. Thus, the City contends the original complaint and amended complaint asserting a § 1983 claim were filed well after the limitations period had run. RWS #1 responds that it has asserted a "continuing violation" of § 192(b), because of the City's pattern and practice of continuing to assert its right to serve water customers in the disputed area, beginning in 1987 and continuing to the present.

### a. The applicable statute of limitations

Section 1983 contains no statute of limitations. *Wilson v. Garcia,* 471 U.S. 261, 280, 105 S.Ct. 1938, 1949, 85 L.Ed.2d 254 (1985). When such a void in federal statutory law

occurs, federal courts have repeatedly "borrowed" the state laws governing an analogous cause of action. *Johnson v. Railway Express Agency, Inc.,* 421 U.S. 454, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975); *O'Sullivan v. Felix,* 233 U.S. 318, 34 S.Ct. 596, 58 L.Ed. 980 (1914); *Kansas Pub. Emps. Retirement Sys. v. Reimer & Koger Assocs., Inc.,* 61 F.3d 608, 611 (8th Cir.1995) (in a federal question case, where there is no federal statute of limitations, the federal court will borrow the forum state's limitations laws, if not inconsistent with federal law or policy), *cert. denied,* —— U.S. ——, 116 S.Ct. 915, 133 L.Ed.2d 845 (1996). For § 1983 claims, courts have "borrowed" the personal injury statute of limitations of the state in which the court sits, identifying that statute in Iowa cases to be Iowa Code § 614.1(2). *Owens v. Okure,* 488 U.S. 235, 236, 109 S.Ct. 573, 574, 102 L.Ed.2d 594 (1989); *Wilson v. Garcia,* 471 U.S. at 280, 105 S.Ct. at 1949; *Schanou v. Lancaster County Sch. Dist. No. 160,* 62 F.3d 1040, 1043 (8th Cir.1995) (parties and court agreed that Nebraska's four-year statute of limitations for personal injuries applied to action pursuant to § 1983); *Sanchez v. United States,* 49 F.3d 1329, 1330 (8th Cir.1995) (holding that both *Bivens* claims and § 1983 claims are governed by the statute of limitations for personal injuries of the forum state, and noting that the applicable statute, Iowa's personal injury statute of limitations, Iowa Code § 614.1(2), provides for a limitations period of two years); *Penn v. Iowa State Bd. of Regents,* 999 F.2d 305, 307 (8th Cir.1993) (applying Iowa's two-year personal injury statute, citing *Wilson); Davis v. Ross,* 995 F.2d 137, 138 (8th Cir.1993) (*per curiam*) (applying Iowa's two-year personal injury statute of limitations, citing *Wycoff v. Menke,* 773 F.2d 983, 984 (8th Cir.1985), *cert. denied,* 475 U.S. 1028, 106 S.Ct. 1230, 89 L.Ed.2d 339 (1986)); *Kaster v. State of Iowa,* 975 F.2d 1381, 1382 (8th Cir.1992) (Iowa's

---

8. These two vehicles, a cause of action under § 1983 and a declaratory judgment action, may be substantially overlapping, and a § 1983 action might provide all of the relief also available from a declaratory judgment action, but the two vehicles of enforcement are not mutually exclusive.

Furthermore, the federal Declaratory Judgment Act "is a procedural statute, not a jurisdictional statute." *State ex rel Missouri Highway Transp. Comm'n v. Cuffley,* 112 F.3d 1332, 1334–35 (8th Cir.1997). Therefore, there must be some basis for federal jurisdiction other than the Declaratory Judgment Act. *Id.* The basis for federal jurisdiction over the Declaratory Judgment Act claim here is federal question jurisdiction, 28 U.S.C. § 1331, based on an alleged violation or threatened violation of 7 U.S.C. § 1926(b).

two-year personal injury statute of limitations applies to a § 1983 action); *Carr v. Aubuchon*, 969 F.2d 714, 716 (8th Cir.1992) (applying Missouri's five-year personal injury statute); *Lown v. Brimeyer*, 956 F.2d 780, 781 (8th Cir.) (Iowa's two-year personal injury statute applies to § 1983 claims, citing *Wycoff*), *cert. denied*, 506 U.S. 860, 113 S.Ct. 176, 121 L.Ed.2d 122 (1992); *Bridgeman v. Nebraska State Penitentiary*, 849 F.2d 1076, 1077 (8th Cir.1988) (applying Nebraska's four-year personal injury statute to § 1983 claim, thus applying *Wilson* retroactively); *Chandler v. Presiding Judge, Callaway County*, 838 F.2d 977, 978–79 (8th Cir.1988) (applying Missouri's five-year personal injury statute of limitations); *Hughes v. Sheriff of Fall River County Jail*, 814 F.2d 532, 533 (8th Cir.) (applying South Dakota's three-year personal injury statute to § 1983 claim), *appeal dismissed and cert. denied*, 484 U.S. 802, 108 S.Ct. 46, 98 L.Ed.2d 10 (1987); *Wycoff*, 773 F.2d at 984.

■ Therefore, in this case, RWS # 1's claim pursuant to § 1983 is governed by the personal injury statute of the state of Iowa. The applicable statute of limitations is Iowa Code § 614.1(2). That statute provides, in pertinent part:

**614.1 Period.**

Actions may be brought within the times herein limited, respectively, after their causes accrue, and not afterwards, except when otherwise specially declared: * * *

2. *Injuries to person or reputation—relative rights—statute penalty.* Those founded on injuries to the person or reputation, including injuries to relative rights, whether based on contract or tort, or for a statute penalty, within two years.

Iowa Code § 614.1(2). Certainly, much of the conduct by the City of which RWS # 1 complains occurred more than two years before the original complaint in this matter was filed. The question is, when did RWS # 1's § 1983 cause of action *accrue?*

*b. "Accrual" and "continuing violations"*

■ A "continuing violation" is an exception to the bar posed by a statute of limitations to claims based on actions that occurred before the statute of limitations period. *Varner v. National Super Markets, Inc.*, 94 F.3d 1209, 1214 (8th Cir.1996) (stating this principle in a Title VII "hostile environment" case), *cert. denied,* —— U.S. ——, 117 S.Ct. 946, 136 L.Ed.2d 835 (1997); *Ashley v. Boyle's Famous Corned Beef Co.*, 66 F.3d 164, 167 (8th Cir.1995) (*en banc* ) (Title VII case). Although the "continuing violation" theory is most often encountered in discrimination cases, it is also applicable to § 1983 claims for continuing violations of a federal law or the Constitution. *See, e.g., Kuhnle Bros., Inc. v. County of Geauga*, 103 F.3d 516, 520 (6th Cir.1997). When a "continuing violation" is shown, the limitations period runs from the "last occurrence" of wrongful conduct. *Varner*, 94 F.3d at 1214; *Gipson v. KAS Snacktime Co.*, 83 F.3d 225, 229 (8th Cir.1996). Furthermore, the entire course of conduct creating the continuing violation is actionable. *Varner*, 94 F.3d at 1214.

■ RWS # 1 has alleged a series or pattern of wrongful actions by the City, encroachments upon RWS # 1's service area, all stemming from the expansion of the City to its current city limits in 1989. Actions that are alleged to be part of this series or pattern of wrongful acts have continued to occur until well within the limitations period, including attempts by the City to serve customers within the disputed territory in 1994, 1995, and, in the case of the "Byl subdivision," 1996. RWS # 1 has supported its allegations of a "continuing violation" with documentary evidence sufficient, at a minimum, to establish a genuine issue of material fact as to whether there have in fact been continuing episodes that form a series or pattern of violations of § 1926(b).

Therefore, there is, at a minimum, a genuine issue of material fact concerning whether RWS # 1's claims asserted pursuant to § 1983 are time-barred. The City is not entitled to summary judgment on this ground, and the court may properly consider the cross-motions for summary judgment on the merits of the § 1983 claim.

## 2. The timeliness of a declaratory judgment action

The question of the timeliness of RWS # 1's declaratory judgment action is not one of being too late, but potentially too early. This is so, because "[t]he case or controversy requirement of Article III applies with equal force to actions for declaratory judgment as it does to actions seeking traditional ... relief." *Marine Equip. Management Co. v. United States,* 4 F.3d 643, 646 (8th Cir.1993) (citing *Foster v. Center Township of La Porte County,* 798 F.2d 237, 242 (7th Cir.1986)); *see also State ex rel. Missouri Highway & Transp. Comm'n v. Cuffley,* 112 F.3d 1332, 1337 (8th Cir.1997) ("The case-or-controversy requirement of Article II applies in declaratory actions, just as it does in coercive actions."). The test recognized by the Eighth Circuit Court of Appeals as applicable to the question of whether there is an actual "case or controversy" for an action under the Declaratory Judgment Act is "whether 'there is a substantial controversy between the parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'" *Id.* (quoting *Caldwell v. Gurley Refining Co.,* 755 F.2d 645 (8th Cir.1985), in turn citing *Maryland Cas. Co. v. Pacific Coal & Oil Co.,* 312 U.S. 270, 61 S.Ct. 510, 85 L.Ed. 826 (1941)); *see also Lake Carriers' Ass'n v. MacMullan,* 406 U.S. 498, 92 S.Ct. 1749, 32 L.Ed.2d 257 (1972) (same test); *Cuffley,* 112 F.3d at 1332, 1337 (" 'The basic inquiry is whether the "conflicting contentions of the parties ... present a real, substantial controversy between parties having adverse legal interests, a dispute definite and concrete, not hypothetical or abstract," ' " quoting *Babbitt v. United Farm Workers, Nat'l Union,* 442 U.S. 289, 298, 99 S.Ct. 2301, 2308, 60 L.Ed.2d 895 (1979), in turn quoting *Railway Mail Ass'n v. Corsi,* 326 U.S. 88, 93, 65 S.Ct. 1483, 1487, 89 L.Ed. 2072 (1945)). Because "substantial controversy" is "imprecise," the Eighth Circuit Court of Appeals has clarified that the decision of whether such a controversy exists is to be made upon the facts on a case-by-case basis. *Id.* (citing *Golden v. Zwickler,* 394 U.S. 103, 108, 89 S.Ct. 956, 959–60, 22 L.Ed.2d 113 (1969)).

Furthermore, in order to be "substantial," the controversy "must be live throughout the course of the litigation and must exist at the time of the district court's hearing of the matter and not simply when the case is filed." *Id.*

Here, the court finds that the three requirements for prosecution of the present declaratory judgment action have been met. First, there is indeed a "live" or "substantial controversy" over whether the actions of the City have violated or may in the future violate § 1926(b). *Id.* Second, that controversy is between parties having adverse legal interests who are properly aligned and present before the court to argue the controversy. *Id.* Third, the controversy remains of sufficient immediacy and reality to warrant the issuance of a declaratory judgment. *Id.* There have been, and for the foreseeable future are likely to be, disputes over which customers "belong" to which entity desiring to provide water services. Thus, the declaratory judgment action is timely.

Furthermore, the court finds this case to be one in which it should exercise its discretion to hear declaratory judgment claims. The Declaratory Judgment Act confers " 'unique and substantial discretion' " upon federal courts, including discretion whether to entertain, stay, or dismiss the action. *Horne v. Firemen's Retirement Sys. of St. Louis,* 69 F.3d 233, 236 (8th Cir.1995) (quoting *Wilton v. Seven Falls Co.,* 515 U.S. 277, 279–280 & 289–290, 115 S.Ct. 2137, 2139 & 2144, 132 L.Ed.2d 214 (1995)); *International Ass'n of Entrepreneurs of Am. v. Angoff,* 58 F.3d 1266, 1270 (8th Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 774, 133 L.Ed.2d 726 (1996); *BASF Corp. v. Symington,* 50 F.3d 555, 557 (8th Cir.1995); *Employers Ins. of Wausau v. Missouri Elec. Works, Inc.,* 23 F.3d 1372, 1374 (8th Cir.1994) (noting that "[a] district court is not obligated to exercise jurisdiction in a diversity case brought under the Declaratory Judgment Act," citing *Brillhart v. Excess Ins. Co.,* 316 U.S. 491, 494, 62 S.Ct. 1173, 1175, 86 L.Ed. 1620 (1942), and discussing grounds for ab-

staining from considering such an action").[9] For example,

> the Declaratory Judgment Act is not to be used either for tactical advantage by litigants or to open a new portal of entry to federal court for suits that are essentially defensive or reactive to state actions. *Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 18 n. 20, 103 S.Ct. 927, 937, 74 L.Ed.2d 765 (1983); *BASF [Corp. v. Symington],* 50 F.3d [555,] 558 [ (8th Cir.1995) ] (citing cases); *Continental Cas. Co. v. Robsac Indus.,* 947 F.2d 1367, 1372–73 (9th Cir.1991); *Omaha Property [and Cas. Ins. Co. v. Johnson],* 923 F.2d [446,] 448 [ (6th Cir.1991) ]; *Continental Airlines [v. Goodyear Tire & Rubber Co.],* 819 F.2d [1519,] 1524 [ (9th Cir.1987) ]; *Transamerica [Occidental Life Ins. Co. v. DiGregorio],* 811 F.2d [1249,] 1253 [ (9th Cir.1987) ]; *Home Fed. Sav. and Loan Assn. v. Ins. Dept. of Iowa,* 571 F.2d 423, 427 (8th Cir.1978). . . .
>
> More specifically, the Declaratory Judgment Act is not to be used to bring to the federal courts an affirmative defense which can be asserted in a pending state action. *Franchise Tax Bd. [of Calif. v. Constr. Laborers Vacation Trust for S. Calif.],* 463 U.S. [1,] 16, 103 S.Ct. at 2849–50, 77 L.Ed.2d 420 [ (1983) ] (discussing *Skelly Oil Co. v. Phillips Petroleum Co.,* 339 U.S. 667, 70 S.Ct. 876, 94 L.Ed. 1194 (1950)); *BASF,* 50 F.3d at 558. In addition, the Declaratory Judgment Act is not meant to expand federal jurisdiction. *Franchise Tax Bd.,* 463 U.S. at 15–16, 103 S.Ct. at 2849–50; *Home Federal,* 571 F.2d at 427 n. 17.

*Angoff,* 58 F.3d at 1270. The court finds none of these misuses of the Declaratory Judgment Act here. Instead, the court finds a legitimate action, arising from a controversy over the proper interpretation of federal law, and the parties ask the court to provide the relief afforded by the Declaratory Judgment Act, that is, "to declare the rights and other legal relations of any interested party." 28 U.S.C. § 2201(a).

Therefore, the declaratory judgment claim, like the § 1983 claim, is properly before the court. With these preliminary questions resolved, the court may consider the portions of the cross-motions for summary judgment concerning the merits of RWS # 1's claims.

### C. The Merits Of The Claims

The questions upon which the parties and *amicus* focused their attentions are the following: Is RWS # 1 entitled to the protections of § 1926(b) and does the City's conduct violate or potentially violate the protections afforded to RWS # 1 by the statute? These two questions, at the heart of this litigation, are contentious indeed. Not only have these questions been argued tooth and nail by the parties, but they have drawn *amicus curiae,* who also see much at stake in how these questions are resolved, into the concrete controversy between the parties. Although the answer to the first question involves primarily interpretation of federal statutes, the answer to the second question involves a rather complicated interplay between federal law and state law, with the companion question of whether the state law is preempted by the federal. Furthermore, if the first and second questions are answered favorably to RWS # 1, the City contends that it is nonetheless entitled to judgment in its favor, because the scope of the § 1926(b) protection asserted by RWS # 1 is a violation of the Tenth Amendment, thus rendering § 1926(b) unconstitutional. This Gordian knot can be untangled only one strand at a time;[10] therefore, the court addresses

---

9. No party has suggested that this court should abstain from hearing this action, so the court will not discuss here the various grounds for abstention from a declaratory judgment action. Suffice it to say that, although the court's decision to exercise jurisdiction is discretionary, that "does not mean that the decision to abstain can be made 'as a matter of whim or personal disinclination.'" *United States Fidelity and Guaranty Co. v. Murphy Oil USA, Inc.,* 21 F.3d 259, 261 (8th Cir.1994) (quoting *Public Affairs Assocs.,*

*Inc. v. Rickover,* 369 U.S. 111, 112, 82 S.Ct. 580, 582, 7 L.Ed.2d 604 (1962) *(per curiam)).*

10. Alexander the Great's simpler solution, slicing through the knot with a sword, *see, e.g., Funk and Wagnalls Standard Dictionary of Folklore, Mythology, and Legend* 460 (Maria Leach, ed., Funk & Wagnalls, 1972); *Bulfinch's Mythology* 44 (Richard P. Martin, ed., 1991), is not available to the court.

first the question of whether RWS #1 is entitled to whatever protections § 1926(b) might afford under the circumstances.

### 1. Is RWS #1 entitled to the protections of § 1926(b)?

#### a. The applicable statutes

Section 1926 of Title 7, enacted as part of the Consolidated Farm and Rural Development Act (CFRDA), governs federal loans made to water and waste facilities. 7 U.S.C. § 1926(b); *Scioto Water*, 103 F.3d at 40. It authorizes the Secretary of Agriculture to make or insure loans to associations, for example, for water conservation, use, development, and control projects. *Id.; Scioto Water*, 103 F.3d at 40.

Subdivision (a) of § 1926 governs the terms of loans made or insured by the Secretary of Agriculture. 7 U.S.C. § 1926(a). The specific subdivision of § 1926 in question here, however, is subsection (b), which provides as follows:

**(b) Curtailment or limitation of service prohibited**

The service provided or made available through any such association shall not be curtailed or limited by inclusion of the area served by such association within the boundaries of any municipal corporation or other public body, or by the granting of any private franchise for similar service within such area *during the term of such loan;* nor shall the happening of any such event be the basis of requiring such association to secure any franchise, license, or permit as a condition to continuing to serve the area served by the association at the time of the occurrence of such event.

7 U.S.C. § 1926(b) (emphasis added). Courts have identified two purposes behind § 1926(b): "(1) to encourage rural water development by expanding the number of potential users of such systems, thereby decreasing the per-user cost, and (2) to safeguard the viability and financial security of such associations (and [Farmers Home Administration's] loans) by protecting them from the expansion of nearby cities and towns." *City of Madison, Miss. v. Bear Creek Water Ass'n*, 816 F.2d 1057,

1060 (5th Cir.1987) (citing S.Rep. No. 566, 87th Cong., 1st Sess., reprinted in 1961 U.S.Code Cong. & Admin. News 2243, 2309); *accord Scioto Water*, 103 F.3d at 40 (quoting *Bear Creek); Lexington–South Elkhorn Water Dist.*, 93 F.3d at 233 ("In order to encourage rural water development by expanding the number of potential users and to safeguard the financial viability of rural associations and Farmers Home Administration loans, 7 U.S.C. § 1926(b) was enacted," citing *Bear Creek); North Alamo Water Supply Corp.*, 90 F.3d at 915 (also citing that Circuit Court of Appeals' prior decision in *Bear Creek* for the purposes of the statute); *CSL Utils., Inc.*, 16 F.3d at 137 ("Section § 1926(b) is, of course, aimed at suppressing competition with a supplier endowed with public funds."). Thus, § 1926(b) protects a borrowing association, and consequently the United States government as a secured party on loans to the association, from curtailment of the association's service area, which is the association's financial base.

In order to fulfill these purposes, the provision " 'should be given a liberal interpretation that protects rural water associations indebted to the FmHA from municipal encroachment.' " *Lexington–South Elkhorn Water Dist.*, 93 F.3d at 235 (quoting *Wayne*, 36 F.3d at 527, in turn quoting *Jennings Water, Inc.*, 895 F.2d at 315); *North Alamo Water Supply Corp.*, 90 F.3d at 915 ("Every federal court to have interpreted § 1926(b) has concluded that the statute should be liberally interpreted to protect FmHA-indebted rural water associations from municipal encroachment."); *Jennings Water*, 895 F.2d at 315 ("All five federal courts that have reviewed section 1926(b) have concluded that the provision should be given a liberal interpretation that protects rural water associations indebted to the FmHA from municipal encroachment.").

Courts have also consistently noted the requirement of § 1926(b) that an association be indebted to the United States in order to obtain the protections of that subdivision. *Scioto Water*, 103 F.3d at 42; *Lexington–South Elkhorn Water Dist.*, 93 F.3d at 235 (describing indebtedness to the FmHA as

one of the "threshold requirements" for protection under § 1926(b), along with "having 'made service available' in the area"); *CSL Utils., Inc.,* 16 F.3d at 133 (recognizing that the protection of § 1926(b) exists only "during the term of such loan."). RWS # 1 does not dispute that it was not indebted to the United States between September 22, 1988, and July 1, 1992. The City contends that RWS # 1 lost the protections of § 1926(b) during the period it was not indebted to the FmHA. However, RWS # 1 contends that it was still entitled to the protection of § 1926(b) during that period by virtue of statutes governing the sell-off by the FmHA of the obligations of water associations held by FmHA. RWS # 1 contends further that its protection under § 1926(b) was renewed when it again became indebted to the United States in 1992.

As part of the Omnibus Budget Reconciliation Act of 1986 (1986 OBRA), the FmHA was required to sell-off some of the bonds and notes it had acquired under § 1926(a). Pub.L. 99–509, § 1001; *see also Scioto Water,* 103 F.3d at 40; *Wayne,* 36 F.3d at 526–27. The provisions of the sell-off were codified in what is now identified as 7 U.S.C. § 1929a *note,* entitled "Sale of Rural Development Notes and Other Obligations." A year later, in the Agricultural Credit Act of 1987 (1987 ACA), Congress modified the terms of the sell-off program established in the 1986 OBRA by requiring the FmHA to offer to the issuer of bonds or notes subject to sale the right to buy them back before the FmHA sold them to a third party. *Scioto Water,* 103 F.3d at 40 (citing Pub.L. 99–509, § 1001, 100 Stat. 1874, as amended by Pub.L. 100–233, § 803, 101 Stat. 1714 (1988), 7 U.S.C. § 1929a *note,* subsection (f)). This requirement is found in a provision referred to by courts as "subsection (f)," because it was codified at 7 U.S.C. § 1929a *note,* subsection (f), and also sometimes as the "right of first refusal" provision. *Scioto Water,* 103 F.3d at 40–41. Subsection (f) provides as follows:

> (f)(1) In general.—Before conducting a sale of a portfolio of notes or other obligations under this section [Pub.L. 99–509, § 1001, amending this section and enacting provisions set out as notes under this section], the Secretary of Agriculture shall—
>
> > (A) determine whether the issuer of any unsold note or other obligation desires to purchase the note or other obligation; and
> >
> > (B) if so, hold open for 30 days, an offer to sell the note or other obligation to the issuer at a price to be determined under paragraph (2) [entitled "Determination of offering price"].

7 U.S.C. § 1929a note, subsection (f). Paragraph (2) of subsection (f) provides for the sale of bonds to the issuer at a discount. 7 U.S.C. § 1929a *note,* subsection (f)(2).

A further modification of the sell-off program instituted by the 1987 ACA was the enactment of so-called "subsection (g)," codified at 7 U.S.C. § 1929a *note,* subsection ( ). Subsection (g) provides as follows:

> Section 306(b) of the Consolidated Farm and Rural Development Act (7 U.S.C. § 1926(b)) shall be applicable to all notes or other obligations sold or intended to be sold under this section [Pub.L. 99–509, § 1001, amending this section and enacting provisions set out as notes under this section].

7 U.S.C. § 1929a *note,* subsection (g); *Scioto Water,* 103 F.3d at 40. RWS # 1 contends that it is entitled to the continued protection of § 1926(b) by virtue of "subsection (g)," because its repurchase of its notes under "subsection (f)" was a purchase of "obligations sold *or intended to be sold*" under 7 U.S.C. § 1929a *note.* The City disagrees, arguing that a sale of bonds or notes to the issuer under "subsection (f)" in which the issuer's debt to the United States is extinguished does not qualify the issuer for the continued protection of § 1926(b) under "subsection (g)."

#### b. *Judicial interpretations*

*i. Scioto Water.* In the only federal decision to consider the question of whether a bond issuer who buys back its own bonds from the FmHA, thereby extinguishing those obligations to the United States, is entitled to the continued protection of § 1926(b), the Sixth Circuit Court of Appeals held that the issuer could no longer invoke the protection

of the statute. *See Scioto Water*, 103 F.3d at 41–42. In *Scioto Water*, the Sixth Circuit Court of Appeals first considered the holding of the Colorado Supreme Court in *City of Grand Junction v. Ute Water Conservancy Dist.*, 900 P.2d 81 (Colo.1995) *(en banc)*, which was the only judicial decision it found, apart from the decision below, to consider the continued protection for a bond issuer under § 1926(b), where the bond issuer bought back its bonds pursuant to the 1986 OBRA. *Scioto Water*, 103 F.3d at 41. The Sixth Circuit Court of Appeals noted that the Colorado Supreme Court had found the bonds in the case before it had not been extinguished by the issuer's repurchase. *Id.* The Sixth Circuit Court of Appeals characterized the reasoning and holding of the Colorado court as follows:

> Because subsection (g) extended § 1926(b) protection to "all notes and other obligations sold or intended to be sold" under the Agricultural Credit Act, the court concluded that § 1926(b) protection should continue even if the bond issuer purchased its own bonds. *[Grand Junction*, 900 P.2d]* at 92. The court believed that because subsection (f) gave bond issuers the "right of first refusal" before the Farmers Home Administration sold the bonds, and was placed in the same act with subsection (g), that Congress meant to create a "comprehensive scheme" that allowed bond issuers to maintain § 1926(b) protection even after they purchased their own bonds. *Id.* In reaching this conclusion, however, the court carefully observed that state law permitted a bond issuer to reacquire its own bonds without extinguishing the debt. *Id.* at 93.

*Scioto Water*, 103 F.3d at 41. The court in *Scioto Water*, however, found that when the bond issuer in the case before it bought back its bonds from the FmHA, the FmHA had marked the notes "paid in full." *Id.* at 42. The court found that the issuer's debt to the United States was discharged, not sold. *Id.* The court consequently found that the issuer was no longer indebted to the United States, and thus had lost the protections of § 1926(b), because it no longer qualified as a debtor for § 1926(b) protection. *Id.* The court wrote,

This statutory interpretation is also faithful to one of the main legislative purposes in enacting § 1926(b)—safeguarding Farmers Home Administration loans. Although the government maintains an interest in providing affordable rural water service, its interest in protecting against competition diminishes as its loans are repaid. We also note that Water 1's reliance on the common law "right of first refusal" does not alter this outcome, which must be gleaned from the federal statutes themselves rather than from such sources as Texas common law.

*Scioto Water*, 103 F.3d at 42.

Accepting the reasoning of the district court below, the Sixth Circuit Court of Appeals held that subsection (g) of § 1929a *note* applies only to obligations sold by the FmHA to third parties. *Id.* The Sixth Circuit Court of Appeals therefore affirmed the district court's dismissal of the plaintiff's action, holding that "having repurchased its own bonds, [the plaintiff] was no longer entitled to the protection provided by § 1926(b) and had failed to state a claim for relief under that section of Title 7." *Id.*

The portion of the district court's unpublished opinion in *Scioto Water* to which the appellate court referred so favorably states as follows:

> Upon a careful reading of all the pertinent statutory provisions, the Court concludes that subsection (g) does not apply to obligations which a debtor has purchased from the FmHA under the debtor buy-out program. The applicable loan [sic] provisions recognize two types of obligations: (1) those to be sold by the FmHA to third parties under § 1929a note, and (2) those to be offered to issuers for purchase under § 1929a note, as amended. Section 1929a note, as amended, subsection (f) differentiates between "a sale of a portfolio of notes or other obligations *under this section*" (referring to 1929a note, which provides only for the sale of FmHA notes to third parties), and an offer to sell to the purchaser [sic], the latter being an alternative which the Secretary must offer before conducting a sale "under this section". Provi-

sion (g) employs similar language, referring to "notes or other obligations sold or intended to be sold *under this section.*" (emphasis added). Attributing the same meaning to the phrase under both provisions, the obligations to which (g) refers are those sold to third parties under § 1929a note, as distinguished from those offered for sale back to debtors. Thus construed, § 1929a note, as amended, extends the protections of § 1926(b) only to those obligations sold by the FmHA to third parties pursuant to the dictates of OBRA.

This interpretation of § 1929a note is consistent with the purpose of the statutory scheme. OBRA mandated that the Secretary generate specified net proceeds by selling notes and other obligations held by it. The extension of loan protections to third-party purchasers would assist the Secretary in satisfying the OBRA requirements by offering an inducement for third parties to purchase FmHA obligations. On the other hand, offering the same incentive to debtors who might wish to participate in the buy-out program would not necessarily further assist the Secretary in fulfilling the statutory mandates. This is so because the buy-out program offers another type of incentive for debtors to purchase their own loans; i.e., a reduction in the amount of debt owed to the FmHA. Accordingly, there is a rational basis for extending the protection of § 1926(b) to obligations sold by the FmHA to third parties, but not to those purchased by debtors through the buy-out program.

In addition, a debtor whose loan is sold by the FmHA to a third party has no control over the transaction and cannot be said to have voluntarily relinquished the benefits conferred by § 1926(b). It is reasonable that Congress desired to extend to a debtor in this situation the same protections the debtor would have received had the FmHA continued to own the debtor's obligation. In contrast, a debtor who opts to purchase its own loan at a discount acts of its own volition and can be said to have voluntarily relinquished any rights bestowed by FmHA ownership of the obligation, including the protection afforded by § 1926(b). These differences afford a rational basis for distinguishing between obligations sold to third parties and those bought back by debtors.

Based on the foregoing, the court finds that § 1929a note, subsection (g), applies only to obligations sold by the FmHA to third parties. Accordingly, accepting Water 1's allegations as true, its bonds were not "sold or intended to be sold" within the meaning of § 1929a note, subsection (g), so as to entitle Water 1 to the protection against curtailment provided by § 1926(b). Because Water 1 is no longer indebted to the FmHA within the meaning of the pertinent statutory provisions, Water 1 has failed to state a claim for relief under § 1926(b).

*Scioto County Regional Water Dist. No. 1, Auth. v. Scioto Water, Inc., et all,* No. C-1-95-204, slip op. at 14-16, 1995 WL 932093 (S.D.Ohio Aug.2, 1995).

Not surprisingly, RWS # 1 takes issue with the holdings of the district and appellate courts in the *Scioto Water* case. RWS # 1 contends that the proper analysis, and proper result, were stated by the Colorado Supreme Court in the *Grand Junction* decision. *City of Grand Junction v. Ute Water Conservancy Dist.,* 900 P.2d 81 (Colo.1995) (*en banc*). Because this decision is the only other one to address the specific question that now troubles this court, the court will also consider it in some detail.

***ii. Grand Junction.*** In the *Grand Junction* decision, the Colorado Supreme Court first held that § 1926(b) expressly preempts state law governing the authority of a public entity to provide domestic water service and held further that § 1926(b) and other applicable federal statutes implicitly preempt state law regulating the discharge of debt evidenced by a bond. *Grand Junction,* 900 P.2d at 87. This court will return to these holdings as necessary below. Turning to the question of more immediate interest here, of whether an issuer who repurchases its obligations from the FmHA is entitled to the continued protection of § 1926(b), the Colorado Supreme Court found that § 803(g) of the 1987 ACA, 7 U.S.C. § 1929a *note,* subsec-

tion (g), referred to here as "subsection (g)," "extends the protection of section 1926(b) to 'all notes or other obligations sold or intended to be sold under this section.'" *Id.* at 91. The court defined its task and forecast its conclusion as follows:

> We must determine whether Congress intended that "all ... obligations sold ... under this section" include reacquisition by an issuer of a bond held by the FmHA, *where the parties intended not to discharge the bond.* Because section 803(f) of the ACA provides a comprehensive scheme for selling bonds held by the FmHA back to the issuers, we conclude that Congress intended to authorize the type of transaction that occurred in the present case.

*Grand Junction,* 900 P.2d at 91 (emphasis added).

After identifying the rule of statutory interpretation that looks first to the plain language of the statute, the court concluded that the language of subsection (g) was unambiguous. *Id.* Specifically, the court found that the word "all" admitted no exceptions. *Id.* Therefore, the court found that subsection (g) "does not provide for any exception to the general rule that the protection provided to rural water districts under section 1926(b) 'shall be applicable to all notes or other obligations sold or intended to be sold under this section'" and the court declined to create such an exception. *Id.* at 92. After considering the plain language of subsection (g), the court held "that [subsection (g)] authorized the FmHA to sell all notes or other obligations without removing the protection provided to rural water districts under section 1926(b), including selling the 1981 revenue bond back to the issuer when the parties intended that the bond remain outstanding." *Id.*

The court found further support for its conclusion in the fact that Congress had provided a comprehensive scheme for selling bonds back to issuers, and the purpose of § 1926(b), which the court identified as protecting the territory served by an association against expansion of municipalities and other public bodies. *Id.* One of the primary purposes of the 1987 ACA, the court found, was to "create an improved secondary market for

FmHA loans," which was a purpose also served by extending the protection of § 1926(b) to bonds repurchased by an issuer with the intent not to discharge the instrument. *Id.*

Next, the court found support for its interpretation in state law. The court found that, under common-law principles, the intent of the parties dictates whether the reacquisition by the issuer of a bond that is also a negotiable instrument discharges the debt or functions simply as a purchase and sale of the instrument. *Id.* at 93. The court found that the intent of the parties in the case before it was to keep the revenue bonds active and not to discharge the debt after the district repurchased the instrument from the FmHA. *Id.* The court found that, "[a]lthough the FmHA had no further rights or obligations under the 1981 revenue bond, neither the FmHA nor the District intended to discharge or cancel the bond." *Id.* This conclusion was supported by expert testimony and documentary evidence, and by the instrument itself, which was not marked "paid in full," or otherwise canceled or discharged; rather, the bond remained outstanding after the district reacquired the instrument. *Id.* at 93–94. Finally, the evidence was undisputed that the parties did not intend to cancel the debt. *Id.* at 94. Therefore, the court concluded, "state law principles, the evidence in the present case, and the district court's findings all support our conclusion that the District repurchased the bond without discharging the underlying debt." *Id.*

This court observes that the factual circumstances underlying the decision in *Grand Junction* are readily distinguishable from the circumstances in either *Scioto Water* or the present case, and consequently the *Grand Junction* decision may provide little guidance in the factual circumstances presented here. That factual difference is that the issuer in *Grand Junction* did not discharge its debt by repurchasing its notes from the FmHA. The holding of the Colorado Supreme Court in *Grand Junction* revolved around this factual distinction, because the court framed the question before it as whether bonds repurchased by the issuer, *but not discharged,* continued the issuer's protection under

§ 1926(b) through subsection (g). *Id.* at 91 ("We must determine whether Congress intended that 'all … obligations sold … under this section' include reacquisition by an issuer of a bond held by the FmHA, *where the parties intended not to discharge the bond*"; emphasis added). That question was not presented in *Scioto Water,* because the court found that the obligation in question *was* discharged. *Scioto Water,* 103 F.3d at 42. Similarly, the undisputed record in this case is that RWS # 1 in fact extinguished its bonds with FmHA when it bought them back.

Clearly, however, there is a split in authority between the *Grand Junction and Scioto Water* decisions on the legal question of whether subsection (g) extends the protections of § 1926(b) to "all" bonds sold by the FmHA, including bonds sold back to issuers, as the Colorado Supreme Court held, or whether the protections of § 1926(b) do not extend to bonds repurchased by the issuer, as the Sixth Circuit Court of Appeals held. Therefore, this court must first consider the proper interpretation of whether subsection (g) continues an issuer's protection under § 1926(b) only where a third party purchases an issuer's obligations from the FmHA or whether it also continues the issuer's protection when the issuer repurchases its obligation under subsection (f).

### c. Plain meaning

In addition to favoring the analysis and conclusions of the Colorado Supreme Court in *Grand Junction* based on what that court found the plain meaning of subsections (f) and (g) of § 1929a *note* to be, RWS # 1 contends that the district and appellate courts in *Scioto Water* erred by failing to consider the legislative history of § 1929a *note,* which RWS # 1 asserts supports the conclusion that § 1926(b) protection was meant to continue whether obligations were resold to the issuer or to a third party. The City counters that, whatever individual members of Congress may have intended, the intent of Congress in enacting § 1926(b) and § 1929a *note* is apparent from the plain language of those statutes, which the City contends plainly states that § 1929a *note* does not extend the protection of § 1926(b) to any

obligor who repurchases its notes from the FmHA pursuant to subsection (f), whether or not the obligor thereby extinguishes its debt to the FmHA. The court must decide whether the meaning of § 1929a *note,* as amended, is plain.

■■■ *i. Rules for "plain meaning" construction.* "The task of resolving the dispute over the meaning of [a statute] begins where all such inquiries must begin: with the language of the statute itself." *United States v. Ron Pair Enters., Inc.,* 489 U.S. 235, 241, 109 S.Ct. 1026, 1030, 103 L.Ed.2d 290 (1989); *Chevron U.S.A. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984); *United States v. Union Elec. Co.,* 64 F.3d 1152, 1165 (8th Cir.1995) (citing *Ron Pair); United States ex rel. Harlan v. Bacon,* 21 F.3d 209, 210 (8th Cir.1994) ("When construing a statute, we are obliged to look first to the plain meaning of the words employed by the legislature …") (citing *Chevron,* 467 U.S. at 842–43, 104 S.Ct. at 2781–82); *United States v. Manthei,* 979 F.2d 124, 126 (8th Cir.1992) ("When interpreting statutory language, the court must first look to the plain meaning of the language," citing *North Dakota v. United States,* 460 U.S. 300, 312–13, 103 S.Ct. 1095, 1102–03, 75 L.Ed.2d 77 (1983)). The Supreme Court describes this rule as the "one, cardinal canon before all others." *Connecticut Nat'l Bank v. Germain,* 503 U.S. 249, 253, 112 S.Ct. 1146, 1149, 117 L.Ed.2d 391 (1992). Thus, "courts must presume that a legislature says in a statute what it means and means in a statute what it says there." *Id.* (citing *Ron Pair,* 489 U.S. at 241–42, 109 S.Ct. at 1030–31; *United States v. Goldenberg,* 168 U.S. 95, 102–03, 18 S.Ct. 3, 4, 42 L.Ed. 394 (1897); *Oneale v. Thornton,* 6 Cranch 53, 68, 3 L.Ed. 150 (1810)).

■■■ When the language of the statute is plain, the inquiry also ends with the language of the statute, for in such instances "the sole function of the courts is to enforce [the statute] according to its terms." *Ron Pair,* 489 U.S. at 241, 109 S.Ct. at 1030 (quoting *Caminetti v. United States,* 242 U.S. 470, 485, 37 S.Ct. 192, 194, 61 L.Ed. 442 (1917)); *Union Elec.,* 64 F.3d at 1165 (quot-

ing *Ron Pair*); *Melahn v. Pennock Ins., Inc.*, 965 F.2d 1497, 1502 (8th Cir.1992) (plain meaning of a statute governs over ambiguous legislative history, citing *Ron Pair Enterprises*). The plain meaning of a statute is decisive, "except in the rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters." *Ron Pair*, 489 U.S. at 242, 109 S.Ct. at 1031 (quoting *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 571, 102 S.Ct. 3245, 3250, 73 L.Ed.2d 973 (1982)); *INS v. Cardoza–Fonseca*, 480 U.S. 421, 452, 107 S.Ct. 1207, 1223–24, 94 L.Ed.2d 434 (1987) (Scalia, J., concurring in judgment) (ordinary meaning governs unless implementing it would be "patent absurdity"); *Waugh v. Internal Revenue Serv.*, 109 F.3d 489, 493 (8th Cir.1997) (quoting *Ron Pair*); *Missouri v. L.J. O'Neill Shoe Co.*, 64 F.3d 1146, 1150 (8th Cir.1995); *Union Elec.*, 64 F.3d at 1165.

▮▮▮ However, "[p]lain meaning, like beauty, is sometimes in the eye of the beholder," *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 737, 105 S.Ct. 1598, 1603, 84 L.Ed.2d 643 (1985). Thus, the court must not reach its decision about the meaning of a statute

> by a strict construction of the words of the Act, nor by application of artificial canons of construction. On the contrary, we are to read the statutory language in its ordinary and natural sense, and if doubts remain, resolve them in the light, not only of the policy intended to be served by the enactment, but, as well, by all other available aids to construction. But it is not our function to engraft on a statute additions which we think the legislature logically might or should have made.

*Bacon*, 21 F.3d at 210–11 (quoting *United States v. Cooper Corp.*, 312 U.S. 600, 605 [61 S.Ct. 742, 743–44, 85 L.Ed. 1071] (1941)). Thus, the court must assume that the words of a statute, construed in their ordinary meaning, accurately express the legislative purpose, and the court should decline to frustrate the plain meaning of the words chosen by the legislature. *United States v. Talley*, 16 F.3d 972, 976 (8th Cir.1994).

*ii. Plain meaning of subsection (f).* Section 1929a *note* originally provided for the sale of notes and other obligations by the Secretary of Agriculture, pursuant to the 1986 OBRA. 7 U.S.C. § 1929a note, subsections (a)-(e). Subsection (f), added by later amendment, provides for the offer of bonds to an issuer *"[b]efore* conducting a sale of a portfolio of notes or other obligations under this section." 7 U.S.C. § 1929a *note*, subsection (f). The word "before" clearly indicates that a sale to the issuer under subsection (f) is a sale separate from and preliminary to a sale to a third party under subsections (a)-(e). Thus, the plain meaning of subsection (f) is that the offer to the issuer is a *prerequisite* to a "sale ... under this section," meaning a sale authorized and conducted as stated in subsections (a)-(e); a sale under subsection (f), however, *is not a* "sale ... under this section," because it is not a sale under subsections (a)-(e).

▮▮▮ To put it another way, the way of the United States District Court for the Southern District of Ohio,

> The applicable [statutory] provisions recognize two types of obligations: (1) those to be sold by the FmHA to third parties under § 1929a note, and (2) those to be offered to issuers for purchase under § 1929a note, as amended. Section 1929a note, as amended, subsection (f) differentiates between "a sale of a portfolio of notes or other obligations *under this section*" (referring to § 1929a note, which provides only for the sale of FmHA notes to third parties), and an offer to sell to the [issuer], the latter being an alternative which the Secretary must offer before conducting a sale "under this section".

*Scioto County Regional Water Dist. No. 1, Auth.*, No. C–1–95–204, slip op. at 14–15. This court holds, based on the plain meaning of the statute, that a sale under subsection (f) is not a "sale under this section [§ 1929a *note*, subsections (a)-(e) ]," but a prerequisite to such a sale. If a sale to the issuer pursuant to subsection (f) is consummated during the thirty day "hold open" period provided for the issuer to accept the offer to buy back its obligations under subsection (f)(1)(B), no "sale under this section," that is, no sale

under § 1929a *note,* subsections (a)-(e), ever takes place.

***iii. Ambiguity of subsection (g).*** The next question is whether subsection (g) extends the protection of § 1926(b) to *both* kinds of sales, a sale to a third party under § 1929a *note,* subsections (a)-(e), and a sale to the issuer under subsection (f). Subsection (g), like subsection (f), refers to a sale "under this section." 7 U.S.C. § 1929a *note,* subsection (g). Use of the same terms in subsections adopted at the same time does, indeed, suggest that those terms were intended to have the same meaning in each subsection, which would be that subsection (g) applies only to a sale to a third party under subsections (a)-(e).

However, subsection (g) refers to "all notes or obligations sold *or intended to be sold* under this section." 7 U.S.C. § 1929a note, subsection (g). RWS # 1 argues strenuously that notes sold to issuers under subsection (f) are notes "intended to be sold" under § 1929a, subsections (a)-(e), even though the obligations are instead sold to the issuer under subsection (f). In short, RWS # 1 contends that "if the note is selected, the note is protected." Rural Water System No. 1's Response To Defendant City of Sioux Center's Motion For Summary Judgment (hereinafter, "RWS # 1 Brief In Resistance To Summary Judgment") at 9. The City responds that the "intended to be sold" language simply doesn't apply to debts paid off by the issuer, citing the *Scioto Water* decisions for interpretations that hold subsection (g) doesn't apply to sales to debtors under subsection (f). The City contends further that RWS # 1's argument strains logic and the language, because if Congress wanted the protections of § 1926(b) to extend to water associations that are no longer indebt-

ed to the United States, it could have found a less obscure way to say so than by implication from "intended to be sold." What the City contends is a "natural rendition" of the language, therefore, is that "intended to be sold" is simply a statement that putting a note up for sale does not impact the quality of the note or security. The City describes RWS # 1's interpretation as giving a "magical afterlife" to debts that have been paid off by allowing them to continue the protections of § 1926(b). Defendant's Memorandum Of Law In Support Of Combined Resistance To Plaintiff's Motion For Summary Judgment Under 7 U.S.C. § 1926(b) And 42 U.S.C. § 1983 (hereinafter, "Defendant's Combined Resistance Brief"), p. 9.

Although the parties have framed the question in terms of selecting between interpretations of subsection (g) based on the "selected-protected" concept or rejection of a "magical afterlife," the crux of the matter, as the court sees it, is whether subsection (g) is ambiguous. " 'The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole.' " *Lovilia Coal Co. v. Harvey,* 109 F.3d 445, 449 (8th Cir.1997) (quoting *Robinson v. Shell Oil Co.,* — U.S. —, —, 117 S.Ct. 843, 846, 136 L.Ed.2d 808 (1997)).[11] The Eighth Circuit Court of Appeals has explained in somewhat more detail how ambiguity is determined, as follows:

> "Ambiguity is a creature not of definitional possibilities but of statutory context." *Brown v. Gardner,* 513 U.S. 115, 118, 115 S.Ct. 552, 555, 130 L.Ed.2d 462 (1994). In other words, "the meaning of statutory

**11.** The Eighth Circuit Court of Appeals has observed that " '[t]he plain meaning of a statute controls, if there is one, regardless of an agency's interpretation.' " *Pelofsky v. Wallace,* 102 F.3d 350, 353 (8th Cir.1996) (quoting *Hennepin County Med. Ctr. v. Shalala,* 81 F.3d 743, 748 (8th Cir.1996)). In this case, the City contends that the Department of Agriculture has taken the position that rural water districts that pay off notes are not protected by § 1926(b), citing the district court's decision in *Scioto Water.* However, in that district court opinion, in a footnote, the court expressed some doubt that it should defer

to an agency opinion expressed in an informal letter from the Office of General Counsel for the Department of Agriculture to counsel for one of the parties before the court. *Scioto Water,* slip op. at 14 n. 8. The district court simply noted that its own independent analysis was in conformity with the Department of Agriculture's informal interpretation. *Id.* This court has the same doubt that any adequate expression of an agency interpretation has been presented, and will therefore conduct its own analysis of the statutes in question without further reference to any agency view.

language, plain or not, depends on context." *Id.* (internal quotation omitted). As the parties remind us, "we must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy." *Hennepin County Med. Ctr. [v. Shalala],* 81 F.3d [743,] 748 [ (8th Cir.1996) ] (internal quotation omitted). At the same time, we must "seek to interpret the statute in a way that includes every word and clause." *Id.*

*Pelofsky v. Wallace,* 102 F.3d 350, 353 (8th Cir.1996). Certainly, RWS # 1's interpretation is a "definitional possibility" for the meaning of "intended to be sold." *Id.* However, that interpretation is unconvincing in light of context, object, and policy of the relevant statutes. *Id.; accord Lovilia Coal Co.,* 109 F.3d at 449 (ambiguity must be determined from context).

As to context, the original portion of § 1929a note, subsections (a)-(e), authorizes the sale of notes and establishes the requirements for such sales. 7 U.S.C. § 1929a *note,* subsections (a)-(e). Subsection (f), however, establishes as a prerequisite to any such sale an offer by the FmHA to sell notes to the issuer. 7 U.S.C. § 1929a *note,* subsection (f). Only when the time for the exercise of the issuer's right to buy the notes under subsection (f) has run can the FmHA sell the notes pursuant to § 1929a note, subsections (a)-(e). As a consequence, this court's reading is that only when the time for exercise of rights under subsection (f) has run, only when the prerequisites have been completed, can the FmHA *intend* to sell the notes pursuant to subsections (a)-(e). Until the thirty days provided in subsection (f)(1)(B) have run, the FmHA *intends* to sell the notes to the issuer pursuant to subsection (f), not to any other interested party pursuant to subsections (a)-(e). Thus, in subsection (g), the words "sold or intended to be sold under this section" refer, as the City suggests, most naturally to notes actually sold under § 1929a *note,* subsections (a)-(e), or intended to be sold, meaning offered but not yet sold, under subsections (a)-(e), not to notes sold or intended to be sold to the issuer under subsection (f). Notes sold to the issuer under subsection (f) are neither notes "sold ... under this sec-

tion," meaning pursuant to subsections (a)-(e), because they have instead been sold under subsection (f), nor are they notes "intended to be sold under this section," because they have already been sold under subsection (f). Thus, in context, notes "intended to be sold under this section" can only mean notes offered for sale pursuant to subsections (a)-(e), but not yet purchased, or notes offered for sale pursuant to subsections (a)-(e), but never purchased at all, and thus still in the hands of the FmHA.

Also relevant to the context of subsection (g) is the difference between the terms of a sale "under the statute," meaning a sale under subsections (a)-(e), and a sale instead under the prerequisite offer to the issuer under subsection (f). A sale under subsections (a)-(e) does not change the terms of the issuer's obligations. 7 U.S.C. § 1929a *note,* subsection (c) ("any sale of notes or other obligations, as described in subsection (a), shall not alter the terms specified in the note or other obligation...."). Such a sale thus changes only the party to whom the issuer is indebted. As the district court in *Scioto Water* observed,

> [A] debtor whose loan is sold by the FmHA to a third party has no control over the transaction and cannot be said to have voluntarily relinquished the benefits conferred by § 1926(b). It is reasonable that Congress desired to extend to a debtor in this situation the same protections the debtor would have received had the FmHA continued to own the debtor's obligation.

*Scioto Water,* slip op. at 16. However, where the issuer instead exercises its rights under subsection (f) to buy back its notes, it does so at a discount. *See* 7 U.S.C. § 1929a *note,* subsection (f)(2)(3). Furthermore, the terms of the note are also altered, to the extent the note is entirely extinguished. Not only are the terms of the note altered, because the note is extinguished, but the terms of the *debt* of the issuer may also be significantly changed, because, pursuant to subsection (f)(3)(3), the nature of the issuer's financing in order to effect the repurchase of bonds is not to be considered by the Secretary. 7 U.S.C. § 1929a note, subsection (f)(3)(B).

This provision is in stark contrast to the terms of § 1929a *note,* subsection (c), which forbids the alteration of terms of the *note* when it is sold pursuant to subsections (a)-(e). 7 U.S.C. § 1929a note, subsection (c).

Because of the benefit of repurchase at a discount, it is not irrational, as RWS # 1 suggests, for an indebted association to buy back its notes and forego the protections of § 1926(b). *See Scioto Water,* slip op. at 15. Rather, it is irrational to read subsection (g) as including notes sold under subsection (f) within a strained reading of notes "intended to be sold under this section," when a sale under subsection (f) involves significantly different timing and terms from a sale under subsections (a)-(e).

 This reading of subsection (g) is also in keeping with the object and policy of the subsection. *Pelofsky,* 102 F.3d at 353 ("object and policy" are relevant to a determination of plain meaning or ambiguity, citing *Hennepin County Med. Ctr.,* 81 F.3d at 748). The object of subsection (g) was patently to make applicable the protections of § 1926(b) to certain notes sold by the FmHA pursuant to the 1986 OBRA sell-off program. *See* 7 U.S.C. § 1929a *note,* subsection (g) (stating that section § 1926($) "shall be applicable" to certain notes affected by § 1929a *note).* To ascertain precisely what policy motivated this subsection, logic dictates that the court should also examine the object and policy of the statute, § 1926(b), that subsection (g) makes applicable to the new circumstances created by the 1986 OBRA.

 The policy behind § 1926(b), as explained above, is "(1) to encourage rural water development by expanding the number of potential users of such systems, thereby decreasing the per-user cost, and (2) to safeguard the viability and financial security of such associations (and [Farmers Home Administration's] loans) by protecting them from the expansion of nearby cities and towns." *Bear Creek Water Ass'n,* 816 F.2d at 1060; *accord Scioto Water,* 103 F.3d at 40 (quoting *Bear Creek); Lexington–South Elkhorn Water Dist.,* 93 F.3d at 233 (also citing *Bear Creek); North Alamo Water Supply Corp.,* 90 F.3d at 915 (also citing that Circuit Court of Appeals' prior decision in *Bear*

*Creek* for the purposes of the statute); *CSL Utils., Inc.,* 16 F.3d at 137. However, the scope of that policy was clearly identified in § 1926(b) itself, because that statute affords its protections only *"during the term of [a FmHA] loan."* 7 U.S.C. § 1926(b) (emphasis added); *Scioto Water,* 103 F.3d at 42 (courts have consistently noted the requirement of § 1926(b) that an association be indebted to the United States in order to obtain the protections of that subdivision); *Lexington–South Elkhorn Water Dist.,* 93 F.3d at 235 (describing indebtedness to the FmHA as one of the "threshold requirements" for protection under § 1926(b), along with "having 'made service available' in the area"); *CSL Utils., Inc.,* 16 F.3d at 133. Thus, reading subsection (g) to extend protection of § 1926(b) only to associations that remain indebted on the same obligation, albeit an obligation now held by a third party, is more in keeping with the object and policy of the underlying statute than is extending protections of the underlying statute to an issuer no longer indebted on the same obligation, let alone one no longer indebted to the United States.

 RWS # 1 contends that the policy of § 1926(b) is also served by extending its protections to an association that has bought out its notes with the FmHA under subsection (f) by incurring new debt from some other source. The court is unpersuaded by this argument, however, because the companion policy of § 1926(b), to protect the United States as the holder of the issuer's note, is not served. *See Scioto Water,* 103 F.3d at 40 (one purpose of section § 1926(b) is "to safeguard the viability and financial security of such associations *(and [Farmers Home Administration's] loans)* by protecting them from the expansion of nearby cities and towns," citing *Bear Creek Water Assn,* 816 F.2d at 1060); *Lexington–South Elkhorn Water Dist.,* 93 F.3d at 233 (§ 1926(b) was enacted "[i]n order to encourage rural water development by expanding the number of potential users and *to safeguard the financial viability* of rural associations *and Farmers Home Administration loans.").* The purpose of § 1926(b) is not to protect a rural water association at all costs; rather, it is,

under the terms of § 1926(b) itself, to protect a rural water association indebted to the United States and the United States as its creditor, or, by virtue of the 1987 ACA, to protect a rural water association indebted to one standing directly in the shoes of the United States as a purchaser of the notes of a rural water association and that new creditor. As the Seventh Circuit Court of Appeals explained in *Jennings Water*, "[T]he primary beneficiaries of section 1926(b)'s ban on association service curtailment are *not the associations themselves,* but rather, *the FmHa* and the individual rural consumers who would not have inexpensive and reliable water service *without FmHA-supported* rural water associations." *Jennings Water, Inc.,* 895 F.2d at 317 (emphasis added).

Although RWS # 1 incurred new debt to buy out its notes held by the United States, the party to whom RWS # 1 became indebted on the new debt did not stand in the shoes of the United States. The new creditor held an entirely different obligation with substantially altered terms from those found in the note held by the United States. Cf. 7 U.S.C. § 1929a *note,* subsection (c) (sale under subsections (a)-(e) must not alter the terms of the loan agreement). That new creditor here, Norwest Bank in Minneapolis, Minnesota, accepted an entirely different obligation from RWS # 1 and took no security whatsoever on the new debt.

RWS # 1 has enjoyed the advantages of the buy-out by obtaining the preferential terms of subsection (f)(2)(B), as well as the advantage of substituting unsecured loans from Norwest Bank for secured loans from the United States. RWS # 1 has identified nothing in the language, context, object, or policy of either § 1926(b) or § 1929a *note, as* amended, that requires a reading of subsection (g) to give RWS # 1 all of the advantages of § 1926(b) as well as the advantages of subsection (f)(2)(B) of § 1929a *note,* nor does the court find subsection (g) ambiguous, such that it reasonably could encompass the meaning RWS # 1 attributes to it.

### d. *Legislative history*

Finally, the court will consider the legislative history RWS # 1 asserts is of such importance to a proper interpretation of subsections (f) and (g). Under normal canons of statutory interpretation, the court takes recourse to legislative history only after determining that the statutory language is ambiguous. *See, e.g., Ratzlaf v. United States,* 510 U.S. 135, 147–48, 114 S.Ct. 655, 662, 126 L.Ed.2d 615 (1994) ("[W]e do not resort to legislative history to cloud a statutory text that is clear."); *Barnhill v. Johnson,* 503 U.S. 393, 401, 112 S.Ct. 1386, 1391, 118 L.Ed.2d 39 (1992) (noting that "appeals to legislative history are well taken only to resolve 'statutory ambiguity'"); *Davis v. Michigan Dep't of Treasury,* 489 U.S. 803, 808 n. 3, 109 S.Ct. 1500, 1504 n. 3, 103 L.Ed.2d 891 (1989) ("Legislative history is irrelevant to the interpretation of an unambiguous statute."); *Coplin v. Fairfield Pub. Access Television Committee,* 111 F.3d 1395, 1407 (8th Cir.1997) ("We need not interpret the legislative history of the Cable Act because its statutory language is clear."); *Citicasters v. McCaskill,* 89 F.3d 1350, 1354–55 (8th Cir. 1996) (citing *Northern States, infra); Northern States Power Co. v. United States,* 73 F.3d 764, 766 (8th Cir.) ("We think that when, as here, the statutes are straightforward and clear, legislative history and policy arguments are at best interesting, at worst distracting and misleading, and in neither case authoritative."), *cert. denied,* — U.S. ——, 117 S.Ct. 168, 136 L.Ed.2d 110 (1996); *United States v. Field,* 62 F.3d 246, 249 (8th Cir.1995) (when the statutory language is not ambiguous, there is "no need to search for clues to Congress' intent in the legislative history"). The court has not found subsection (g) (or subsection (f)) to be ambiguous. However, quite recently, the Eighth Circuit Court of Appeals considered legislative history in the alternative after finding that the statutory term in question in the case before it was not ambiguous. *See Lovilia Coal Co.,* 109 F.3d at 449 (finding statutory term "claim" unambiguous, but observing that, even if the term in question was ambiguous, the legislative history made clear that the appropriate interpretation was as the court had found from the plain meaning of the statute); *accord Bear Creek,* 816 F.2d at 1059–60 (finding that "[w]hile we need not resort to legislative history where, as here,

the statutory language is unambiguous and yields no absurd result, ... we note that our interpretation of § 1926(b) comports with the purposes found in its legislative history").

Although RWS #1 has included in its submissions on the cross-motions for summary judgment a substantial bound "Legislative Folio," RWS #1 considered at length in its briefing only one excerpt as supportive of its interpretation of subsection (g). That excerpt is the comments of Senator Boren, the sponsor of the amendment that became subsection (g). The pertinent portion of Senator Boren's comments is as follows: [12]

Mr. BOREN. Mr. President, I send to the desk an amendment and ask for its immediate consideration....

Mr. President, this amendment [subsection (g) ] which I have sent to the desk will ensure that the provision in current law which prohibits the curtailment or limitation of service of rural water associations would continue to be applicable to any note or obligation sold, or intended to be sold, by the Secretary of Agriculture.

Under section 306(b) [7 U.S.C. § 1926(b) ] of the Consolidated Farm and Rural Development Act, the area served by an association receiving a rural water and sewer loan cannot be curtailed or limited by inclusion of the area within the boundaries of any municipal corporation or other public body, or by granting any private franchise for similar service within the same area during the term of the rural water and sewer loan.

As my colleagues will recall, section 1001 of the Omnibus Budget Reconciliation Act of 1986 [7 U.S.C. § 1929a note, then consisting of subsections (a)-(e) ] requires the Secretary of Agriculture to sell rural water and sewer loans during fiscal years 1987 through 1989. *While the act specifically prohibits the alteration of the terms specified in the loan if the loan is sold, apparently a question has recently been raised with respect to the ability of the Farmers Home Administration to enforce the applicability of section 306(b) of the Consolidat-*

*ed Farm and Rural Development Act once the loan is sold.*

*To clarify this issue, this amendment will specifically provide that the provisions of section 306(b) would be applicable to all loans sold, or intended to be sold, by the Secretary of Agriculture.*

I understand that the Department of Agriculture has no objection to this amendment, which is a clarifying amendment. I also understand that it has been cleared on both sides of the aisle and, therefore, Mr. President, I urge the acceptance of the amendment.

133 CONG. REC. S.16918 (daily ed. Dec. 2, 1987) (statement of Sen. Boren) (emphasis added). Although, as RWS #1 points out, subsection (f) had already been introduced in the House as a proposed amendment, and had passed that body, when Senator Boren offered the amendment that became subsection (g), Senator Boren did not couple his amendment to subsection (f) when he introduced that amendment. Rather, his reference to the context of subsection (g) is to "section 1001 of the Omnibus Budget Reconciliation Act of 1986," *id., the unamended* portion of § 1929a *note* consisting of subsections (a)-(e).

Indeed, from the entirety of Senator Boren's comments quoted above, it is clear to this court that the senator was relating his amendment only to a sale of notes to a third-party as contemplated by the unamended version of § 1929a *note.* First, Senator Boren explained that the 1986 OBRA requires the sale of notes, and that "the act specifically prohibits the alteration of the terms specified in the loan if the loan is sold." *Id.* That limitation is found in subsection (c) of § 1929a *note,* which specifically states that its limitation on alteration of terms applies to sales "described in subsection (a)." 7 U.S.C. § 1929a *note,* subsection (c) ("[A]ny sale of notes or other obligations, as described in subsection (a), shall not alter the terms specified in the note or other obligation, except that, on sale, a note or other obligation shall not be subject to the provisions of section 333(c) of the Consolidated Farm and Rural

---

**12.** The excerpt quoted here by the court is rather more complete than the excerpt quoted by RWS #1 in briefing, and the court finds the additional portions it has included particularly significant.

Development Act [section 1983(c) of title 29]."). The manner in which the amendment appears to be a "clarifying" one, as the court reads this excerpt of legislative history, is to clarify that the prohibition on alteration of the terms of the loan as a result of a sale pursuant to subsection (a) should be read to include the continued viability of the protections of § 1926(b) for loans sold under subsection (a). There is simply no reason to be concerned about a prohibition on the alteration of terms of a loan when the loan is not sold to a third party, but is instead sold to the issuer and thereby extinguished. Second, the senator offers no explanation whatsoever of the meaning of "intended to be sold." Certainly, the senator does not tie "intended to be sold" to a prerequisite sale under subsection (f). Instead, he again uses that phrase only in relation to a sale under subsection (a) to indicate that the terms of the loan are not altered by the sale or prospective sale. Third, this portion of legislative history demonstrates persuasively that subsection (g) follows subsection (f) only by virtue of the order in which the amendments were engrafted onto the 1986 OBRA buy-out program during the legislative session that produced the 1987 ACA, not by virtue of any intent that subsection (g) include subsection (f) within its protections.

Consequently, the court cannot conclude that this portion of the legislative history requires a different reading of subsection (g). If anything, Senator Boren's comments show that subsection (g) was intended to relate only to a sale under subsections (a)-(e), not to a prerequisite sale to the issuer under subsection (f) in which alteration of terms of the loan as a result of the sale is irrelevant, because the debt is extinguished. Furthermore, although the court has combed through the additional portions of the legislative history found in RWS # 1's legislative folio, and considered the inferences RWS # 1

asserts in its briefing should arise from the legislative history, the court finds nothing in the legislative history either clearly supportive of RWS # 1's interpretation of subsection (g) or plainly contrary to the court's.

### e. RWS # 1's entitlement to § 1926(b) protection

The court can only conclude from (1) what the court finds to be the unambiguous, "plain meaning" interpretation of subsections (f) and (g), in light of the language, context, object, and policy of those subsections, see Pelofsky, 102 F.3d at 353 (ambiguity is determined from context, object, and policy); accord Lovilia Coal Co., 109 F.3d at 449 (ambiguity must be determined from context), and (2) the support for its reading the court garners from the legislative history, and the lack of contrary indications in that legislative history, see Lovilia Coal Co., 109 F.3d at 449 (observing that legislative history made clear that the court's "plain meaning" reading of terms found not to be ambiguous was correct), that the protection of § 1926(b) through subsection (g) does not extend to a party such as RWS # 1 who bought back its notes pursuant to subsection (f), and thereby extinguished them.[13] Consequently, RWS # 1 lost the protections of § 1926(b) when it bought back its notes in 1988 and did not regain any protection of § 1926(b) until RWS # 1 again became indebted to the United States in 1992.

As a consequence of this conclusion, RWS # 1 simply cannot state a claim that the City violated § 1926(b) when it annexed portions of the disputed territory in 1989. RWS # 1 simply had no protection of § 1926(b) to assert against that annexation. Furthermore, the court need never reach RWS # 1's first preemption argument, which is that even if state law permitted the City's expansion to its 1989 city limits, superior federal law, in

---

13. Whether the court would reach a different conclusion, as did the Colorado Supreme Court in Grand Junction, if RWS # 1 had repurchased its notes without extinguishing them or intending to extinguish them, is a matter that is simply too speculative to consider in light of a record revealing no genuine issue of material fact that RWS # 1 ceased to be indebted on the obligations it bought back from the United States.

Here, it suffices to say that the court is not persuaded by the Colorado Supreme Court's reading of subsection (g) as applying to any sale of notes pursuant to the 1986 OBRA as amended by the 1987 ACA, including a sale to an issuer under subsection (f), rather than simply to sales to third parties under subsection (a) of § 1929a note, as held by both the federal district and appellate courts in Scioto Water.

the form of § 1926(b), forbade such an expansion. As a matter of *federal* law, as the court has construed the applicable statutes, RWS # 1 simply had no preemptive federal rights to assert against that expansion by the City, even if that expansion curtailed RWS # 1's then-existing service area. The City is therefore entitled to summary judgment in its favor on any part of any claim in which RWS # 1 asserts that the City's expansion to its 1989 city limits involved a curtailment or limitation of RWS # 1's service area in violation of § 1926(b), as well as concomitant summary judgment in its favor that its expansion to its 1989 city limits *did not* constitute a violation of § 1926(b). RWS # 1's motions for summary judgment will therefore be denied in pertinent part, and the City's motion for summary judgment will be granted in pertinent part.

However, questions remain for disposition on the cross-motions for summary judgment filed by the parties. The over-arching question among these becomes, what was the extent of RWS # 1's protection under § 1926(b) as of July 1, 1992, when RWS # 1 again took out a loan from the FmHA? That issue, just as hotly contested as the last, is addressed in the next section.

### 2. Has the City violated or threatened to violate § 1926(b)?

As the Sixth Circuit Court of Appeals recently observed,

> Section 1926(b) has been construed as "unambiguously prohibit[ing] any curtailment or limitation of an FmHA-indebted water association's services resulting from municipal annexation or inclusion." *Bear Creek Water Assoc., Inc.,* 816 F.2d at 1059. The statutory language "indicates a congressional mandate that local governments not encroach upon the services provided by such associations, be that encroachment in the form of competing franchises, new or additional permit requirements, or similar means." *Id.*

*Lexington–South Elkhorn Water Dist.,* 93 F.3d at 235. The Fifth Circuit Court of Appeals describes the protections afforded by § 1926(b) much more succinctly: "The service area of a federally indebted water association is sacrosanct." *North Alamo Water Supply Corp.,* 90 F.3d at 915; *Wayne,* 36 F.3d at 527 ("Courts have uniformly understood [§ 1926(b)] as forbidding [municipal] encroachment."); *Jennings Water,* 895 F.2d at 314 ("The statute explicitly prohibits municipal encroachment on a rural water association's service area by means of annexation or grant of private franchise."); *Glenpool Utility Servs. Auth. v. Creek County Rural Water Dist. No. 2,* 861 F.2d 1211, 1214 (10th Cir.1988) (same), *cert. denied,* 490 U.S. 1067, 109 S.Ct. 2068, 104 L.Ed.2d 633 (1989); *Bear Creek,* 816 F.2d at 1059 (same).

### a. Elements of a claim for violation of § 1926(b)

In order to prevail on a claim that a municipality or other entity has violated § 1926(b), a rural water association such as RWS # 1 must establish the following elements: (1) it is an "association" within the meaning of the Act; (2) it has a qualifying outstanding FmHA loan obligation; and (3) it has provided or made service available in the disputed area. *Lexington–South Elkhorn Water Dist.,* 93 F.3d at 234; *accord North Alamo Water Supply Corp.,* 90 F.3d at 915 (identifying the elements of the claim as "(1) [the association asserting protection] has a continuing indebtedness to the FmHA, and (2) the [opposing party] has encroached on an area to which the [protected association] 'made service available.' "). The parties do not dispute that RWS # 1 is an "association" within the meaning of the act. *See, e.g., Lexington–South Elkhorn Water Dist.,* 93 F.3d at 234 (citing 7 U.S.C. § 1926(a)(1) & (13), and 7 C.F.R. § 1942.17(b)(1), as establishing the identity of an "association" within the meaning of § 1926(b)). Nor do the parties dispute that, at least as of July 1, 1992, RWS # 1 had a qualifying outstanding loan obligation to the FmHA. *Lexington–South Elkhorn Water Dist.,* 93 F.3d at 235 (describing indebtedness to the FmHA as one of the "threshold requirements" for protection under § 1926(b), along with "having 'made service available' in the area"); *North Alamo Water Supply Corp.,* 90 F.3d at 915 (identifying "indebtedness to the FmHA" as one of the elements of a claim of violation of § 1926(b)). Thus, the element of RWS # 1's

claims that is at issue is whether RWS # 1 has provided or made service available in the disputed area. *Lexington–South Elkhorn Water Dist.,* 93 F.3d at 234 (identifying this as the third element of a claim of violation of § 1926(b)).

### b. *"Made service available"*

Although the federal regulations explain that an association must "provide adequate service to all persons within the service area who can feasibly and legally be served," 7 C.F.R. § 1942.17(n)(2)(vii), "neither the statute nor the regulations specifically defines the terms 'provided' or 'made available.'" *Lexington–South Elkhorn Water Dist.,* 93 F.3d at 235. The lack of applicable statutory or regulatory definitions, however, does not leave the court wholly without guidance on this question.

*i. Tests.* Recent decisions indicate that courts must "look to the law governing the way in which a water district must provide service to potential customers to determine whether [a qualifying association] has provided or made service available in the disputed areas." *Id.* Courts have routinely looked to applicable state law to make that determination. *See, e.g., id.* (looking to Kentucky law establishing certification prerequisites for water districts to provide service in an area to determine where a water district has "made service available"); *North Alamo Water Supply Corp.,* 90 F.3d at 913 (in a similar inquiry, noting that the association had obtained the certificate of convenience and necessity required under Texas law in order to serve an area). Thus, the first test, or first prong of the test, of "made service available" looks at legal authority to provide service. Courts have also routinely looked to the proximity of the water association's distribution lines to the areas in dispute. *Lexington–South Elkhorn Water Dist.,* 93 F.3d at 235. This latter test has been referred to by the parties and *amicus* in this case as the "pipe-in-the-ground test." The point of this test, or prong of the test, is that whether an indebted association has "made service available" also depends upon physical ability to provide water services.

Thus, the question of whether an association has "made service available" involves both whether service is physically available, "by virtue of [the association's] line adjacent to property," and whether an association has legal rights and responsibilities to provide such service, as determined by applicable law. *Lexington–South Elkhorn Water Dist.,* 93 F.3d at 235; *Glenpool Utility Servs. Auth. v. Creek County Rural Water Dist. No. 2,* 861 F.2d 1211, 1214 (10th Cir.1988), *cert. denied,* 490 U.S. 1067, 109 S.Ct. 2068, 104 L.Ed.2d 633 (1989). A recent decision of the Sixth Circuit Court of Appeals demonstrates the interplay of these two requirements, a legal right to serve and physical ability to serve.

*ii. Interplay of legal flight and physical ability to serve.* In *Lexington–South Elkhorn Water Dist.,* 93 F.3d at 235, the Sixth Circuit Court of Appeals first considered the *complaining* association's legal right to provide service in the disputed territory:

Lexington–South Elkhorn admits that it has not obtained a Certificate of Public Convenience and Necessity from the Kentucky Public Service Commission to construct facilities or to serve customers within portions of the disputed areas, and has had no requests for service from potential customers in the areas at issue. In our view, these concessions distinguish this case from other cases in which courts have upheld water districts' rights to Section § 1926(b) protection from municipal encroachment based on the fact that the water districts were actually and actively providing service, or clearly had made service available.

*Lexington–South Elkhorn Water Dist.,* 93 F.3d at 235–36. Thus, the court first determined that the association had no legal right or responsibility to provide water service in the disputed territory. In the alternative, the court also found that the association had no actual, physical ability to provide water in the disputed area. *Id.* at 236. After surveying cases applying the "physical ability" or "pipe-in-the-ground test," the court wrote,

These cases teach that whether an association has made service available is determined based on the existence of facilities

on, or in the proximity of, the location to be served. If an association does not already have service in existence, water lines must either be within or adjacent to the property claimed to be protected by Section § 1926(b) prior to the time an allegedly encroaching association begins providing service in order to be eligible for Section § 1926(b) protection. Based on the location of Lexington–South Elkhorn's distribution lines, it had not made service available prior to the time that Wilmore began providing service to the disputed properties. Thus, although the Water District qualifies as an "association" and has an outstanding qualifying loan, it is unable to show that it has provided service or made service available in the disputed areas, and is therefore not entitled to the Section § 1926(b) protection that might otherwise have been available.

*Lexington–South Elkhorn Water Dist.*, 93 F.3d at 236–37. The requirement of both a legal right or responsibility to serve and a physical ability to serve were reiterated in the court's conclusion:

> In sum, an association's ability to serve is predicated on the existence of facilities within or adjacent to a disputed property. By its clear terms, Section § 1926(b) does not provide an automatic, exclusive right to serve, but rather provides protection only if certain conditions are met. Among those conditions are that an association has at least made service available. *In this case, Lexington–South Elkhorn has not established its authorization to serve the disputed properties or its ability to provide the service. Not having facilities available, and not having requested authority from the Public Service Commission to construct facilities, Lexington–South Elkhorn's availability of service is merely speculative.*

*Lexington–South Elkhorn Water Dist.*, 93 F.3d at 238 (emphasis added). The court therefore held that the association asserting § 1926(b) protection was ineligible for such protection. *Id.*[14]

Perhaps taking the relationship between legal authority to serve and physical ability to serve one step further, the Fifth Circuit Court of Appeals has held that a state law duty to provide service is the legal equivalent to the physical ability to "make service available" under § 1926(b). *North Alamo Water Supply Corp.*, 90 F.3d at 916 (identifying the "legal" and "factual" determinations of right and physical ability to serve an area as "alternatives"). This court concurs in that conclusion, but concludes further that, where state law *prohibits* an association from providing service in a disputed area, the association cannot rely upon its actual provision of service, or physical ability to provide service, as *trumping* its lack of legal authority to provide service, absent a showing of estoppel or some other impediment to the assertion of the state-law prohibition. Rather, a legal right and responsibility to serve an area may stand alone as fulfilling the "made service available" requirement of § 1926(b),[15] *see id.,* but having pipes in the ground, standing alone, does not. Where an association relies on its physical ability to serve, having pipes in the ground, it must also have the legal right and responsibility to serve. In other words, this court finds that the "pipe-in-the-ground test" is not the exclusive test for determining an indebted association's protected service area. This is so, for several reasons.

First, the Secretary of Agriculture has interpreted an indebted association's authority to provide water service in a way that sheds light on the scope of § 1926(b) protection. Under federal regulations, an indebted asso-

---

**14.** Consequently, the court never reached the question of whether the district court erred in failing to define the specific service area of the association in which it was entitled to § 1926(b) protection, among other questions raised by the parties. *Id.*

**15.** Although the court agrees with the Fifth Circuit Court of Appeals on this issue, the court does have before it any such question in the factual circumstances of this case. Here, in no part of the disputed territory does RWS # 1 rely solely on its legal right or responsibility to serve. RWS # 1 does, however, rely exclusively on its physical ability to serve parts of the disputed area annexed by the City during the period RWS # 1 was not indebted to the FmHA as justifying revivification of its § 1926(b) protections for the annexed area.

ciation is authorized, indeed required, "[t]o provide adequate service to all persons within the service area who can feasibly *and legally* be served." 7 C.F.R. § 1942.17(n)(2)(vii) (emphasis added); *see also Lexington–South Elkhorn Water Dist.,* 93 F.3d at 235 (identifying this regulation as related to, but not defining, the meaning of "made service available" in § 1926(b)). Where an indebted association has no legal right to provide service, it is not required by the regulation to provide such service, and, logically, it also should not obtain protection from § 1926(b) for its illegal provision of service. Second, construing "made service available" to mean *"legally* made service available" may effectively avoid Tenth Amendment questions. *See Cotto Waxo Co. v. Williams,* 46 F.3d 790, 792 (8th Cir.1995) (recognizing as a canon of statutory construction that the court should interpret a statute so as to uphold its constitutionality); *TCI of North Dakota, Inc. v. Schriock Holding Co.,* 11 F.3d 812, 815 (8th Cir.1993) ("courts are obligated to interpret statutes in such a way as to avoid constitutional infinities," citing *DeBartolo Corp. v. Florida Gulf Coast Trades Council,* 485 U.S. 568, 575, 108 S.Ct. 1392, 1397–98, 99 L.Ed.2d 645 (1988)).[16] Here, if § 1926(b) is interpreted to allow an indebted association to invoke the protections of that statute even when the association is providing service in a manner illegal under state law, then the statute could run afoul of both the Takings Clause of the Constitution and the reserved power of the states under the Tenth Amendment to exercise sovereign authority over their territory.[17] *See TCI of North Dakota, Inc.,* 11 F.3d at 815 (construing a statute in such a way as to avoid a Takings Clause question, where a constitutionally sound interpretation was an acceptable construction of the statute). Third, this court can find no case in which any court of appeals has rejected a state-law definition of an association's service area, as opposed to a municipality's encroachment under color of state law, which courts do not tolerate. *See, e.g., Glenpool Utility Serv.,* 861 F.2d at 1216 (rejecting state law as justifying an encroachment upon territory protected by superior federal law in the form of § 1926(b), but noting that the preemptive effect of the federal statute is not permanent, but contingent upon the district's outstanding federal debt). Rather, courts have routinely looked to state law as defining an association's protected service area under § 1926(b). *See, e.g., Lexington–South Elkhorn Water Dist.,* 93 F.3d at 235 (looking to Kentucky law, which imposes various obligations on rural water districts, including a requirement that the district obtain a certificate of convenience and necessity, to determine where the district has "made service available"); *North Alamo Water Supply Corp.,* 90 F.3d at 916 (identifying similar requirements of Texas law as sufficient to establish where an indebted association has "made service available").

■■■■■ In summary, while this court agrees with the Fifth Circuit Court of Appeals that a legal right and duty to serve is sufficient to fulfill the requirements of § 1926(b) that an indebted association have made service available, *North Alamo Water Supply Corp.,* 90 F.3d at 916, this court holds that the physical ability to serve an area is *not* sufficient to satisfy the statutory requirement that the association have "made service

---

**16.** In *TCI,* the Eighth Circuit Court of Appeals also wrote,

> As the Supreme Court has stated:
> [W]here an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress.... This approach not only reflects the prudential concern that constitutional issues not be needlessly confronted, but also recognizes that Congress, like this Court, is bound by and swears an oath to uphold the Constitution.
> *DeBartolo Corp. v. Florida Gulf Coast Trades Council,* 485 U.S. 568, 575, 108 S.Ct. 1392,

1397–98, 99 L.Ed.2d 645 (1988) (internal citations omitted). If we were to adopt TCI's broad definition of "dedicated," serious questions would arise as to whether [the statute in question] violated the Takings Clause of the federal constitution.... Because the legal definition of "dedicated" is an "acceptable construction of the statute," we avoid any such potential "constitutional concerns."
*TCI of North Dakota, Inc.,* 11 F.3d at 815.

**17.** Indeed, these are the Tenth Amendment challenges to RWS #1's interpretation of § 1926(b) that the City asserts here.

available" where there is a *legal* impediment to providing such service. Similarly, the court holds that providing actual service does not extend the protections of § 1926(b) to an indebted association's service of disputed territory in which the association has no legal right to provide service.

### iii. Preemption of state-law determinations of service area.

This conclusion is not undermined by principles of federal preemption of state law. "Statutory" preemption is the child of congressional authority, found in the Supremacy Clause of the U.S. Constitution, and congressional action, embodied in enactment of a statute. *See, e.g., New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins.,* 514 U.S. 645, 653–55, 115 S.Ct. 1671, 1676, 131 L.Ed.2d 695 (1995) (the Supreme Court's "past cases have recognized that the Supremacy Clause, U.S. Const., Art. VI, may entail preemption of state law" by a law enacted by Congress). The Eighth Circuit Court of Appeals has observed that "[p]reemption traditionally comes in four 'flavors' ":

> (1) "express preemption," resulting from an express Congressional directive ousting state law (*Morales v. Trans World Airlines, Inc.,* [504] U.S. [374] 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992)); (2) "implied preemption," resulting from an inference that Congress intended to oust state law in order to achieve its objective (*Hines v. Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941)); (3) "conflict preemption," resulting from the operation of the Supremacy Clause when federal and state law actually conflict, even when Congress says nothing about it (*Florida Lime & Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 143, 83 S.Ct. 1210, 1218, 10 L.Ed.2d 248 (1963)); and (4) "field preemption," resulting from a determination that Congress intended to remove an entire area from state regulatory authority (*Fidelity Fed. Savs. & Loan Ass'n v. de la Cuesta,* 458 U.S. 141, 153, 102 S.Ct. 3014, 3022, 73 L.Ed.2d 664 (1982)). *See Pacific Gas & Elec. Co. v. State Energy Resources Conservation & Dev. Comm'n,* 461 U.S. 190, 203–04, 103 S.Ct. 1713, 1721–22, 75 L.Ed.2d 752 (1983); *see generally,* Burt

Neuborn, *An Overview of Preemption* (Fed.Jud.Ctr., Feb. 9, 1993).

*Kinley Corp. v. Iowa Utilities Bd.,* 999 F.2d 354, 358 n. 3 (8th Cir.1993); accord *New York State Conference of Blue Cross,* 514 U.S. at 653–55, 115 S.Ct. at 1676 (preemption of state law occurs "either by express provision, by implication, or by a conflict between federal and state law").

Thus, federal law preempts state law not only where the two are plainly contradictory, but also where " 'the incompatibility between [them] is discernible only through inference.' " *Hankins v. Finnel,* 964 F.2d 853, 861 (8th Cir.1992) (quoting *Hayfield Northern R.R. Co. v. Chicago & N.W. Transp. Co.,* 467 U.S. 622, 627, 104 S.Ct. 2610, 2614, 81 L.Ed.2d 527 (1984)), *cert. denied sub nom. Missouri v. Hankins,* 506 U.S. 1013, 113 S.Ct. 635, 121 L.Ed.2d 566 (1992). To put it another way, "[p]reemption ... will arise when 'state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.' " *Id.* (quoting *Schneidewind v. ANR Pipeline Co.,* 485 U.S. 293, 300, 108 S.Ct. 1145, 1150–51, 99 L.Ed.2d 316 (1988), in turn citing *Hines,* 312 U.S. at 67, 61 S.Ct. at 404); *see also Silkwood v. Kerr–McGee Corp.,* 464 U.S. 238, 248, 104 S.Ct. 615, 621, 78 L.Ed.2d 443 (1984) (preemption occurs when "it is impossible to comply with both state and federal law," or "state law stands as an obstacle to the accomplishment of the full purposes and objectives of Congress."); *Kinley,* 999 F.2d at 357 (the Supremacy Clause " 'invalidates state laws that "interfere with, or are contrary to," federal law,' " quoting *Hillsborough County v. Automated Med. Labs., Inc.,* 471 U.S. 707, 712, 105 S.Ct. 2371, 2375, 85 L.Ed.2d 714 (1985)).

There are a number of reasons state law defining the service area of an indebted association is not preempted by § 1926(b). First, as explained above, no federal statute or regulation defines "made service available" within the meaning of § 1926(b). *Lexington–South Elkhorn Water Dist.,* 93 F.3d at 235 ("neither the statute nor the regulations specifically defines the terms 'provided' or 'made available.' "). Therefore, there is no federal law to have preemptive effect on

any state law defining an indebted association's service area.

■ Second, the court is not saying that state law can be used to justify a municipality's encroachment upon disputed area in which an indebted association is legally providing service under state law. The state law used to justify the encroachment would clearly conflict with or stand as an obstacle to, the non-encroachment provisions of § 1926(b), and consequently would be preempted by superior federal law in the form of § 1926(b). *See, e.g., Kinley Corp.,* 999 F.2d at 358 n. 3; *Hankins,* 964 F.2d at 861. Therefore, there is express and conflict preemption of any state law that purports to take away from an indebted association any territory in which the association has both a legal and physical ability to provide service at the time the association is first entitled to invoke the protection of § 1926(b).

■ However, the scope of this preemptive effect of the federal statute on state law permitting encroachment upon a service area is specifically limited to periods when the association is indebted to the United States. *Scioto Water,* 103 F.3d at 42; *Lexington–South Elkhorn Water Dist.,* 93 F.3d at 235; *CSL Utils., Inc.,* 16 F.3d at 133. Section § 1926(b) thus creates only a "window" of federal preemption of any state law permitting encroachment of a municipality on the existing service area of an association; that window opens when the association becomes indebted to the United States, and closes when the association ceases to be indebted to the United States or a third party standing precisely in the shoes of the United States by virtue of a purchase of notes under § 1929a *note,* subsections (a)-(e).

■■ What the court is saying is that there is no express preemption of state law that *defines* the service area of an association at the moment the association becomes indebted to the United States, and is thereby entitled to the protection of § 1926(b). Section § 1926(b) expressly prohibits only *curtailment or limitation* of the existing service area of the association by some *action* of a municipality (presumably under color of state law) to include the association's existing ser-vice area within the municipality's boundaries. 7 U.S.C. § 1926(b). It does not expressly prohibit a state-law definition of the existing service area of an association at the moment the association can invoke the protections of § 1926(b) by becoming indebted to the United States. Nor is there conflict preemption, because the federal statute certainly does not prohibit a definition of the service area of an association by state law prior to the association becoming indebted. Rather, state law that defines the service area of an association prior to or at the time it becomes indebted is state law that stands *outside* the window of § 1926(b) preemption and also is state law that can reasonably coexist with the federal law.

■ RWS # 1 seems to assert that preemption of any state law definition of service area as of the moment the association is entitled to invoke § 1926(b) protection arises from a conflict between a state-law definition of service area and the pipe-in-the-ground test. RWS # 1 would have it that having pipes in the ground is the sole test of "made service available." RWS # 1's reading would allow an association to turn back the clock to assert a service area anywhere the association had *ever* laid pipes, without regard to operation of state law during a period outside the limited window of § 1926(b) preemption, which courts have construed to be *only* the period when an association is indebted. As construed by this and other courts, however, the state-law and pipe-in-the-ground tests are not independent tests, but prongs of a single test for "made service available." *See Lexington–South Elkhorn Water Dist.,* 93 F.3d at 235–37. The court finds no conflict, because the court simply cannot read § 1926(b) to revivify, via the pipe-in-the-ground test, an association's right to serve in an area lost by operation of state law during a period when the association was not indebted to the FmHA. This is so, because the federal statute expressly prohibits, and thus preempts, only actions by a municipality to annex the service area of an association after that association becomes indebted to the United States.

■ *iv. Interplay of state and federal law.* Thus, the court concludes that the

**1530**

protected service area of an indebted association is defined by looking to state and federal law. To put the matter in concrete terms applicable to the facts of this case, if an indebted association ceases to be indebted to the FmHA, or a third party who stands precisely in the shoes of the FmHA by virtue of buying notes of an association under § 1929a *note,* subsections (a)-(e), as a matter of federal law, the association loses its protection under § 1926(b). State law, and only state law, then defines a municipality's right to annex portions of the association's service area, just as state law, and only state law, otherwise defines where it is the association can legally initiate or continue to provide service. If the association again becomes indebted to the FmHA, its protected service area is defined by state law as of the date of the renewed indebtedness. The association's protected service area would consist of territory in which it had the legal right to serve, as defined by state law, as well as the territory in which it had the legal right to serve *and* the physical ability to serve. However, the association could not claim the protection of § 1926(b) in territory properly annexed by the municipality, even if the association still had pipes remaining in the ground, because in such an area, the association would not have the legal right to provide service, standing alone, nor would the association have the physical ability to serve *and* the legal right to serve. Nothing about § 1926(b) permits the association to "look back" to claim all of the territory in which it had a physical ability to serve or once provided such service and to claim § 1926(b) protection solely on the basis of that physical ability to serve. To repeat, § 1926(b) cannot be read to revivify an association's right to serve in an area lost by operation of state law during a period when the association was not indebted to the FmHA.

### c. *Where did RWS #1 make service available?*

The court found above that the answer to the question of where RWS #1 "made service available" is determined by the interplay, or coincidence, of the "legal authority" to serve and the "pipe-in-the-ground" test of physical ability to serve.

The court therefore begins this portion of its inquiry with an examination of where RWS #1 had the legal authority to provide water service as of July 1, 1992, the date RWS #1 again became indebted to the United States and therefore was again able to assert the protection of § 1926(b). Furthermore, as the court stated above, the answer to the question of where RWS #1 had a legal right to serve depends entirely upon applicable *state* law.

*i. Legal authority to serve.* Except for its assertion that the City's expansion to its 1989 city limits encroached upon protected service area, an assertion dispensed with by this court's conclusion that RWS #1 had no protection under § 1926(b) at the time of that annexation, RWS #1 does not contend that the City's annexation in 1989 violated either state or federal law. The question is really what territory beyond the City's 1989 city limits the City gained the exclusive right to serve upon expansion to its 1989 city limits.

The City relies upon Iowa Code § 357A.2 as establishing its exclusive right to serve customers within two miles of its 1989 city limits, and contends further that RWS #1 has never complied with statutory requirements to seek permission from the City to serve customers within the two-mile zone by submitting a notice of intent and a plan to the City. The City argues that this statute expressly applies to RWS #1, because it expressly applies to an association incorporated under Iowa Code Ch. 504A. Thus, the City argues, under the statute, RWS #1 could not provide water services within two miles of the limits of the city. Iowa Code § 357A.2 (a covered entity "shall not" provide water services within the two-mile zone).

RWS #1 contends that, as a rural water *association* organized under Iowa Code Ch. 504A, not a "rural water *district*" organized under Iowa Code Ch. 504A, the provisions of Iowa Code Ch. 357A upon which the City relies do not apply. It also contends that, even if it is subject to the two-mile zone created by Iowa Code § 357A.2, pursuant to that statute, annexation by the City cannot

oust it from its "franchise" as defined by pipes in the ground on April 1, 1987.

Unfortunately, neither the court nor the parties have found any decisions of any Iowa state court interpreting Iowa Code § 357A.2. However, it is fortunate indeed that the differences between § 357A.2 as it existed in 1989 and as it existed after amendments in 1992 are not outcome determinative of issues here, because the parties have not adequately traced the language of Iowa Code § 357A.2 as it existed at all times relevant in this litigation, quoting to the court only the version of the statute as amended in 1992.

In 1987, the Iowa legislature amended Iowa Code § 357A.2 to add the part of the statute pertinent here, the part establishing what this court will call the "two-mile rule." Acts 1987 (72 G.A.) ch. 109, § 2. The pertinent portion of the statute then read as follows:

> Water services, other than water services provided as of April 1, 1987, shall not be provided within two miles of the limits of a city by a rural water district incorporated under this chapter or chapter 504A unless the city has approved a new water service plan submitted by the district. If the new water service plan is not approved

by the city, the plan may be subject to arbitration.

Iowa Code § 357A.2. This is the version of the statute that was effective at the time the City expanded to its 1989 city limits.[18]

In *Olympus Aluminum Prods., Inc. v. Kehm Enters., Ltd.*, 930 F.Supp. 1295 (N.D.Iowa 1996), this court reviewed extensively the rules of statutory interpretation applied by the Iowa Supreme Court. Suffice it to say here that the touchstone of statutory interpretation under Iowa law, as under federal law, is legislative intent. *City of West Branch v. Miller*, 546 N.W.2d 598, 602 (Iowa 1996) ("In interpreting statutes, our ultimate goal is to determine legislative intent," citing *Peffers v. City of Des Moines*, 299 N.W.2d 675, 678 (Iowa 1980)). When the language of a statute is plain and its meaning is clear, Iowa courts "should not reach for meaning beyond [the statute's] express terms.... Nor should we resort to statutory rules of construction to determine legislative intent." *Id.* (internal citation omitted). Where reasonable minds differ as to the meaning of a statute,

> [o]ne ... rule [of construction] provides that we are bound by what the legislature

---

**18.** The parties have cited to the court only the version of § 357A.2 as later amended in 1992. Acts 1992 (74 G.A.) ch. 1015, §§ 3, 4. That version of the statute provides in comparable part as follows:

> Water services, other than water services provided as of April 1, 1987, shall not be provided within two miles of the limits of a city by a rural water district incorporated under this chapter or chapter 504A except as provided in this section.
>
> A rural water district incorporated under this chapter or chapter 504A may give notice of intent to provide water service to a new area within two miles of a city by submitting a water plan to the city. The plan is only required to indicate the area within two miles of the city which the rural water district intends to serve. If the city fails to respond to the rural water district's plan within ninety days of receipt of the plan, the rural water district may provide service in the area designated in the plan. The city may inform the rural water district within ninety days of receipt of the plan that the city requires additional time or information to study the question of providing water service outside the limits of the city. If additional time or information is required, the city shall respond to the rural water district's

plan within one hundred eighty days of receipt of the plan. In responding to the plan, the city may waive its right to provide water service within the areas designated for service by the rural water district, or the city may reserve the right to provide water service in some or all of the areas which the rural water district intends to serve. If the city reserves the right to provide water service within some or all of the areas which the rural water district intends to serve, the city shall provide service within four years of receipt of the plan. This section does not preclude a city from providing water service in an area which is annexed by the city.

Iowa Code § 357A.7 (1991; Supp.1992). The main difference between this version of Iowa Code § 357A.2 and the earlier version is that the requirements for notice by a rural water district and the effect of a municipality's response were changed. Under the former version of § 357A.2, a municipality had to approve a rural water district's service plan before the rural water district could serve customers identified in the plan. Iowa Code § 357A.2 (1987). However, under the later version, Iowa Code § 357A.2 (1991; Supp.1992), if a municipality did not respond to a rural water district's service plan, the rural water district was authorized to provide service in the area designated in the plan. *Id.*

said, rather than what it should or might have said. *State v. Jones,* 464 N.W.2d 241, 242 (Iowa 1990); Iowa R.App.P. 14(f)(13). We may not, under the guise of statutory construction, enlarge or otherwise change the terms of a statute. *Jones,* 464 N.W.2d at 242. Finally, "[w]e may consider the language used in the statute, the objects sought to be accomplished, the evils and mischiefs sought to be remedied and place a reasonable construction on the statute which will best effect its purpose rather than one which will defeat it." *Peffers,* 299 N.W.2d at 678.

*Miller,* 546 N.W.2d at 602. Legislative intent is " 'expressed by omission as well as by inclusion.' " *Wiebenga v. Iowa Dept. of Transp.,* 530 N.W.2d 732, 735 (Iowa 1995) (quoting *Barnes v. Iowa Dept. of Transp.,* 385 N.W.2d 260, 263 (Iowa 1986)). Thus, if the legislature had intended a statute to include a prohibition on certain conduct, the Iowa Supreme Court believes the legislature would have specifically mentioned that conduct, but where it did not, the statutory provision is deemed not to apply to that conduct. *Id.* Similarly, if the legislature had intended one statutory provision to apply without regard to another statutory provision already in force, it would have said so. *See Federal Land Bank of Omaha v. Bryant,* 445 N.W.2d 761, 762 (Iowa 1989); *Federal Land Bank of Omaha v. Sleister,* 444 N.W.2d 504, 506 (Iowa 1989). Finally, "[w]hen statutes relate to the same subject matter or to closely allied subjects they are said to be in pari materia and must be construed, considered and examined in light of their common purpose and intent so as to produce a harmonious system or body of legislation." *Farmers Co-op. Co. v. DeCoster,* 528 N.W.2d 536, 538 (Iowa 1995).

■■■■■ Applying these rules of construction, the court finds that Iowa Code § 357A.2, as it existed in 1987, and as it remained after amendments in 1992, does *not* apply the two-mile rule to every sort of association providing water services. Rather, § 357A.2 establishes the two-mile rule as applicable only to "a rural water district incorporated under this chapter or chapter 504A." Iowa Code § 357A.2. The City glosses over this language, assuming that it applies to

RWS # 1, because RWS # 1 was incorporated under Iowa Code Ch. 504A, without observing any difference between a rural water association, such as RWS # 1, and "a rural water district." RWS # 1 contends, however, that "rural water districts" are peculiar kinds of creatures created by either of two statutes, and further, that RWS # 1 is not either kind of creature.

Iowa Code Ch. 357 authorizes creation of "benefited water districts" by a county board of supervisors. Iowa Code § 357.1. Iowa Code § 357.1 incorporates a two-mile rule applicable to such "benefited water districts" in terms almost identical to those found in Iowa Code § 357A.2. Iowa Code Ch. 357A, on the other hand, authorizes the creation of a water district by petition of area property owners to a county board of supervisors. Iowa Code § 357A.2. The court will describe this second kind of water district as a "special water district." Iowa Code Ch. 357A further permits, but does not require, "nonprofit corporations incorporated under [Iowa Code] chapter 504A for the specific purpose of operating a rural water system" to petition a county board of supervisors "for incorporation of a [special water] district, in the manner provided by section 357A.2." Iowa Code § 357A.20 (nonprofit corporation *"may* petition" for reincorporation as a water district under Iowa Code Ch. 357A).

■■■■■ Giving Iowa Code § 357A.2 its plain meaning, *Miller,* 546 N.W.2d at 602, and reading Iowa Code §§ 357A.2 and 357A.20 *in pari materia, DeCoster,* 528 N.W.2d at 538, it is apparent that Iowa Code § 357A.2 does not make applicable its two-mile rule to every nonprofit water service corporation incorporated under Iowa Code Ch. 504A, but only to Chapter 504A corporations that have *reincorporated* as water *districts* under Iowa Code § 357A.20. First, this is what the statute in question actually says. Iowa Code § 357A.2 ("Water services ... shall not be provided within two miles of the limits of a city *by a rural water district incorporated under this chapter or chapter 504A").* Only a rural water corporation originally incorporated under Chapter 504A that has reincorporated under § 357A.20 is a "rural water

*district*" incorporated under Chapter 504A. Pursuant to the terms of Iowa Code § 357A.20, such a reincorporated district ceases to exist as a Chapter 504A entity, Iowa Code § 357A.20(2), although it does continue to operate under its Chapter 504A directors, officers, articles of incorporation, and bylaws until its first annual meeting. Iowa Code § 357A.20(3), (4), and (5). Thus, the plain meaning of the reference to a water *district* incorporated under Chapter 504A in § 357A.2 is to a nonprofit water service corporation that originally incorporated under Chapter 504A, but then reincorporated as a "district" under § 357A.20.

Second, although the establishment of the two-mile rule applicable to "benefited water districts" under § 357.1 and a similar rule applicable to "special water districts" under § 357A.2 may suggest that the Iowa legislature intended to provide municipalities with a two-mile exclusivity zone against *all* non-municipal water service entities, that is not what the Iowa legislature actually said. Had the legislature intended to bar water services by *every* other entity within two miles of a municipality, this court may fairly conclude that the legislature would have said so. *Wiebenga*, 530 N.W.2d at 735. Furthermore, this court is "bound by what the legislature said, rather than what it should or might have said," and the court "may not, under the guise of statutory construction, enlarge or otherwise change the terms of a statute." *Miller*, 546 N.W.2d at 602. So far as the parties have shown the court and so far as the court has found from its own research, the, Iowa legislature has not created a general "two-mile rule" providing municipalities with a zone of exclusivity for water services against all comers.

Therefore, Iowa Code § 357A.2 does not define or limit RWS # 1's service area to an area more than two miles outside of the City's 1989 city limits.[19] The City has not asserted that there is any other legal limitation on RWS # 1's right or authority to serve customers in the disputed area. Therefore, in this case, RWS # 1's protected service area does depend entirely upon the second prong of the test, RWS # 1's physical ability to serve customers in the disputed territory.

■ *ii. Physical ability to serve.* Turning to the "pipe-in-the-ground test," the court finds genuine issues of material fact preclude summary judgment in favor of either party on the question of encroachment upon RWS # 1's protected service area. After reviewing the decisions in *Jennings Water, Glenpool Util. Servs. Auth., and Bear Creek*, the Sixth Circuit Court of Appeals in *Lexington–South Elkhorn Water Dist.* explained the test of physical ability to serve as follows:

> These cases teach that whether an association has made service available is determined based on the existence of facilities on, or in the proximity of, the location to be served. If an association does not already have service in existence, water lines must either be within or adjacent to the property claimed to be protected by Section 1926(b) prior to the time an allegedly encroaching association begins providing service in order to be eligible for Section 1926(b) protection.

*Lexington–South Elkhorn Water Dist.*, 93 F.3d at 237. Although the record includes maps of where RWS # 1's and the City's respective water lines run, the information provided by the maps and other exhibits, the court finds, does not remove all doubts about where RWS # 1 was physically able to provide service as of July 1, 1992, when RWS # 1 again became indebted to the United States.

The principal problem is a dispute between the parties over the purpose of one line, built in 1988, which runs through Sioux Center proper and connects parts of RWS # 1's network on each side of the City. The City contends that there was an agreement that the line was a dedicated "transmission" line, not a service line, and thus it cannot be used as part of the "pipe-in-the-ground test" to determine whether RWS # 1 was making

---

**19.** By the same token, the City cannot mount a Tenth Amendment challenge to § 1926(b) as impinging on the reserved rights of the state by taking from the City its exclusive rights to pro-vide water service in the two-mile zone. The City simply never had such a right by operation of *state* law.

service available to customers adjacent to that line. RWS # 1 and *amicus* urge the court to recognize that a dichotomy between "transmission" and "service" lines is unrealistic in a rural setting, because long lines must be run to widely separated properties, and any such line might be tapped to provide a "service" connection to a property anywhere along the line.

█ Although the court is convinced that, ordinarily, it would be artificial at best to maintain a distinction between "service" and "transmission" water lines in a rural setting, the City has generated a genuine issue of material fact as to whether the specific line in question was a dedicated "transmission" line as a matter of agreement between the parties. The court would be inclined to recognize a promise limiting water facilities to a specific kind of use, and would be unsympathetic to arguments that such an agreement should be ignored when it suits a party's interests to renounce the agreement. However, the court cannot yet make any determinations on the purpose of the line. The City has produced documents, admittedly all generated by persons on its side of the question, supportive of the City's belief that the line in question would be a dedicated "transmission" line, not a service line. What the record does not reveal is what RWS # 1's understanding of any agreement was at the time the line was built. However, the documentation the City has produced as evidence of an agreement concerning the limitation on use of the line in question is sufficient to fulfill the City's' burden, as the non-movant for summary judgment, to go beyond the pleadings, and designate "specific facts showing that there is a genuine issue for trial." *Fed.R.Civ.P.* 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *McLaughlin v. Esselte Pendaflex Corp.,* 50 F.3d 507, 511 (8th Cir. 1995); *Beyerbach,* 49 F.3d at 1325. Therefore, genuine issues of material fact surround whether each of the pipes in the ground can be considered in applying the "pipe-in-the-ground test." Those genuine issues of material fact preclude summary judgment on the ultimate question of whether the City has encroached on RWS # 1's service area in violation of § 1926(b).

Having identified these genuine issues of material fact, the court does not deem it necessary to recount here other portions of the disputed area that are subject to other genuine issues of material fact as to RWS # 1's physical ability to provide service and the City's encroachment on such service area. However, the court is also satisfied that the City has generated genuine issues of material fact as to RWS # 1's actual physical ability to serve all of the territory it claims is now protected by § 1926(b). Suffice it to say that this matter will proceed to trial on the question of the extent of RWS # 1's protected service area, outside of the City's 1989 city limits, and whether encroachments by the City on that protected service area have actually occurred or been threatened.

## V. CONCLUSION

The court concludes first that RWS # 1 has asserted two different claims for violation of § 1926(b). One such claim is brought via 42 U.S.C. § 1983, and the other via the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202. Neither of these claims is time-barred, the § 1983 action because the court finds a "continuing violation" has been pleaded and adequately supported by the record for summary judgment purposes, and the declaratory judgment claim because there is a substantial controversy between the parties that is appropriate for determination at this time.

Turning to the merits of RWS # 1's claims on the cross-motions for summary judgment, the court concludes that provisions of the 1987 ACA, found at 7 U.S.C. § 1929a *note,* did not extend the protections of § 1926(b) to an association such as RWS # 1 that extinguished its debt to the United States during the buy-out program authorized by the 1986 OBRA. First, the plain meaning of subsection (f) of § 1929a *note* is that the offer to the issuer is a *prerequisite* to a "sale ... under this section," meaning a sale authorized and conducted as stated in subsections (a)-(e) of § 1929a *note;* a sale under subsection (f), however, *is not* a "sale ... under this section," because it is not a sale under subsections (a)-(e).

The court next concludes that subsection (g) of § 1929a *note*, which extends § 1926(b) protection to notes "sold or intended to be sold under this section," does not extend § 1926(b) protection to notes sold to the issuer under subsection (f). Notes sold to the issuer under subsection (f) are neither notes "sold ... under this section," meaning pursuant to subsections (a)-(e), because they have instead been sold under subsection (f), nor are they notes "intended to be sold under this section," because they have already been sold under subsection (f). The context of subsection (g) confirms this interpretation, because of the significant differences between a sale under subsections (a)-(e), which does not change the terms of the note, and a sale under subsection (f), which allows a buy out of the note on favorable terms and extinguishment of the debt. This interpretation of subsection (g) is also in keeping with the policy of the underlying statute, § 1926(b), to protect not only an indebted association, but the United States as a creditor. Extending that protection only to a party who stands precisely in the shoes of the United States, by purchasing a note from the United States, is more in keeping with the purpose of § 1926(b) than is extending that protection to a party no longer indebted to the United States or a third party on the same obligation. Finally, the legislative history provides nothing plainly contrary to this court's reading nor plainly supportive of a reading of subsection (g) as extending § 1926(b) protection to an issuer no longer indebted to anyone on the obligation formerly held by the United States. Rather, the legislative history makes clear that the sponsor of the amendment that became subsection (g) intended it to clarify the continued applicability of § 1926(b) to a sale of notes to a third party, not to a sale of notes to the issuer.

As a consequence of these conclusions concerning the interpretation of the applicable federal statutes, the court concludes that RWS # 1 lost the protections of § 1926(b) when it bought back its notes in 1988 and did not regain any protection of § 1926(b) until RWS # 1 again became indebted to the United States in 1992. RWS # 1 simply cannot state a claim that the City violated § 1926(b) when it annexed portions of the disputed territory in 1989, because RWS # 1 simply had no protection of § 1926(b) to assert against that annexation. Summary judgment in favor of the City is therefore **granted** on any part of any claim in which RWS # 1 asserts that the City's expansion to its 1989 city limits involved a curtailment or limitation of RWS # 1's service area in violation of § 1926(b), and that part of RWS # 1's cross-motion for summary judgment asserting that the City's expansion to its 1989 city limits violated § 1926(b) is **denied.**

The question of whether curtailments or threatened curtailments of RWS # 1's service area occurred in violation of § 1926(b) after July 1, 1992, when RWS # 1 again became indebted to the United States, cannot be resolved on summary judgment. The court concludes that RWS # 1's service area, where it "made service available," must be determined by the coincidence of RWS # 1's legal right or authority to serve, a matter of state law, and its physical ability to serve, a matter of fact determined by the "pipe-in-the-ground test." The court finds that the Iowa statute the City contended established RWS # 1 had no legal right to serve within two miles of the City's 1989 city limits is not applicable to an entity such as RWS # 1, which is not a "special water district," but has instead remained a water service association.

Therefore, the question of the extent of RWS # 1's protected service area turns on RWS # 1's physical ability to serve portions of its service area. Where RWS # 1 was physically able to serve is the subject of genuine issues of material fact. In particular, the court finds that the City has generated genuine issues of material fact as to whether RWS # 1 agreed that one of its lines would be only a dedicated transmission line, thus excluding that line from defining where RWS # 1 physically made service available. Other fact questions persist as to RWS # 1's physical ability to serve the entirety of the area outside of the City's 1989 boundaries that RWS # 1 claims is protected by § 1926(b).

Consequently, the cross-motions for summary judgment are **denied** to the extent not

otherwise resolved above, and this matter will proceed to trial on the question of the extent, of RWS # 1's physical ability to serve all portions of its asserted service area outside of the City's 1989 city limits and the City's encroachment upon any protected service area.

**IT IS SO ORDERED.**